MARY S. KINIRY, EXECUTRIX (ESTATE OF RICHARD J. KINIRY) *v.* DANBURY HOSPITAL ET AL.

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued January 14—decision released April 14, 1981

*Arnold J. Bai,* with whom, were *Karen L. Karpie* and, on the brief, *Leland S. Englebardt,* for the appellants (defendants).

*Michael P. Koskoff,* with whom was *Brenda C. Morrissey,* for the appellee (plaintiff).

PETERS, J.   This is a medical malpractice case arising out of the death of a patient at the Danbury Hospital.  The plaintiff, Mary S. Kiniry, executrix of the estate of Richard J. Kiniry, brought a wrongful death action alleging medical malpractice against three defendants, the Danbury Hospital, Homer L. Fegley, M.D., and Thomas M. Malloy, M.D.  Before trial, a settlement was reached with Malloy, and the case against him was withdrawn. The jury returned a plaintiff's verdict against both of the remaining defendants.  In post-trial motions, the defendants asked the trial court to set the verdict aside, to arrest the judgment, to order a remittitur, and to reduce the verdict of $1,800,000 by $250,000, which was the amount of the Malloy settlement.   The court granted only the last of these motions, and the defendants have appealed from the judgment rendered against them.

In their appeal, the defendants claim that the trial court erred in its charge to the jury and in its refusal to set aside the verdict as to damages.  Evidentiary questions noticed in the preliminary statement of issues have not been briefed and are therefore deemed to have been abandoned.  *Czarnecki* v. *Plastics Liquidating Co.,* 179 Conn. 261, 262–63, 425 A.2d 1289 (1979) ; *Manley* v. *Pfeiffer,* 176 Conn. 540, 541, 409 A.2d 1009 (1979) ; Maltbie, Conn. App. Proc. § 327.

There was evidence before the jury from which they could have found the following facts.  Richard Kiniry, then thirty years old, fell down some basement stairs at his home in Danbury on November

23, 1974, at about 9 p.m. He struck his head and was unconscious for more than eight minutes. His wife called for emergency assistance and two emergency medical technicians responded promptly. They helped him up the stairs and took him in an ambulance to the Danbury Hospital. They observed that he was confused and disoriented, and that he lapsed into semiconsciousness; they applied a splint to a wrist that appeared deformed. Kiniry arrived at the Danbury Hospital's emergency room at approximately 9:42 p.m.

Upon arrival at the emergency room, Kiniry was examined by Homer L. Fegley, a full-time hospital emergency room physician in the employ of the Danbury Hospital. Fegley obtained a history from Kiniry, his wife, and the emergency technicians; he learned that Kiniry had been unconscious and had a nose bleed. A neurological examination conducted by Fegley showed normal reflexes but pupils that were small and failed to respond to light. Fegley noted the wrist deformity and ordered x-rays of the skull and wrist. While the patient was being x-rayed Fegley telephoned Thomas M. Malloy, who was the "on call" orthopedic surgeon that evening, and Malloy agreed to come in to see the patient. Fegley did not call Jesse Manlapaz, the neurosurgeon on call that night.

Kiniry was returned from the x-ray department to the orthopedic room to await Malloy's arrival. In the meantime, he continued to show signs of mental confusion and complained of a severe headache; he also became nauseated and vomited. The x-rays, which had been taken at approximately 10 p.m., were read by a hospital radiologist. The radiologist reported to Fegley, between 10:30 p.m. and 10:45

p.m., that the skull x-ray revealed a fracture over the middle meningeal artery. Fegley discussed the report with Mrs. Kiniry, advised that her husband be hospitalized for observation, and told her that an orthopedic surgeon had been called to set the fractured wrist.

Malloy saw Kiniry in the orthopedic room at about 11:15 p.m. He examined the patient, set his wrist, ordered compazine for his nausea, and admitted him to the hospital's intensive care unit for observation relating to the head injury.

Kiniry remained in the intensive care unit on November 24, 1974, from approximately 12:45 a.m. until 3:15 a.m. when he was taken to surgery. Although the patient had previously been lethargic, after his arrival on the floor he became restless, agitated and combative. He was incoherent and delusional, and had to be restrained. The nursing staff in the intensive care unit checked the patient's vital signs upon his arrival on the floor, at 12:45 a.m., again at 1 a.m., and again at 2 a.m. By 2 a.m., the patient's condition had deteriorated markedly. There was first a difference in the size of his pupils and then his pupils became fixed and dilated. He moved one side of his body more freely than the other. Malloy was called at about 2:15 a.m., and he in turn then, for the first time, contacted the "on call" neurosurgeon, Manlapaz. Manlapaz found the patient in a deep coma when he arrived at 3:10 a.m.

Manlapaz performed surgery upon Kiniry in the early hours of November 24, 1974. He removed a large epidural hematoma on the right side of his brain which had resulted from the fracture of the temporal bone and resultant laceration of the middle meningeal artery. He also found and removed a

small subdural hematoma on the left side of the brain. Kiniry never regained consciousness after the surgery and died on November 30, 1974.

The plaintiff presented expert testimony that the defendant Danbury Hospital had failed to comply with the standards of care applicable in 1974 to similar cases in Connecticut hospitals. The witnesses testified, and the jury could have found, that the Danbury Hospital departed from the applicable standard in two major respects in its treatment of Kiniry on November 24 and 25, 1974. The hospital failed to implement adequate rules to provide for immediate consultation of a neurosurgeon when a patient in Kiniry's condition arrived at the hospital. The hospital's nursing staff failed to monitor and record with sufficient frequency the condition of a patient such as Kiniry, and failed to call the attending physicians soon enough when a patient in Kiniry's condition began to deteriorate.

There was similar expert testimony about the defendant Fegley's departure from the standard of care applicable to emergency room physicians in Connecticut in 1974. That testimony indicated departure from established standards in Fegley's failure to call a neurosurgeon immediately upon learning of Kiniry's skull fracture, in his failure to perform an adequate neurological examination and to order adequate neurological nursing care, and in his referral of the patient to a specialist who was known, or should have been known, to be unqualified to treat head injuries.

The expert witnesses agreed that the departure from the established standards of care by each of the defendants was a substantial factor in causing

the death of Kiniry. If the jury believed this testimony, and found the requisite underlying facts to have been established, they were entitled to find the defendants negligent. The jury returned a general verdict for the plaintiff against the defendants in the amount of $1,800,000.[1]

## I

The defendants, on this appeal, do not contest the sufficiency of the evidence to support a finding that they were negligent. Although they do not concede their negligence, their principal argument focuses on the conduct of the orthopedist Malloy. They maintain that Kiniry died because of Malloy's failure to obtain a prompt neurosurgical consultation after he had agreed to see Kiniry as his patient. The defendants thus claim that their negligence, if any, was not the proximate cause of Kiniry's death and that Malloy's conduct constituted an intervening or superseding cause sufficient to break the causal connection between any negligence on their part and Kiniry's death. This argument was vigorously presented to the jury at the trial. The defendants' first claim of error is that the court erred in its instructions to the jury on causation, so that this defense argument was not accurately before the jury in their deliberations.

We will, in the interest of justice; Practice Book § 3164; review this claim of error although it is by no means clear that the defendants have properly presented it. In the trial court, after having taken exception to the charge as given, they failed to except to the court's corrected charge. This was not a case in which the trial court refused to correct its

---

[1] This verdict was, on motion, reduced by $250,000, which was the amount of the settlement with Malloy.

charge. If the defendants believed that the supplemental charge was still incorrect, they should have alerted the court to their continuing objection. See Practice Book § 315; *Enlund* v. *Buske,* 160 Conn. 327, 332, 278 A.2d 815 (1971); *Terrazzano* v. *Sporna,* 157 Conn. 39, 43, 244 A.2d 599 (1968). In this court, in claiming error, the defendants have failed to comply with the requirement that their brief "shall include a verbatim statement of all relevant portions of the charge and all relevant exceptions to the charge." Practice Book § 3060F (c) (2). Experienced counsel should recognize that the requirement of "a verbatim statement" calls for something more than references to pages of a transcript. The verbatim statement should have been included in the defendants' initial brief, rather than in the reply brief responding to the plaintiff's objection to the form in which the claim of error was raised.

We turn now to the merits of the claimed error in the charge concerning causation. The trial court instructed the jury that the conduct of the orthopedist Malloy might have discharged the defendant Fegley from liability in one of three ways. The jury were told that they might find that Malloy's conduct was an independent intervening cause, the sole proximate cause, or a superseding cause of Kiniry's death, and thus discharge the defendant Fegley from liability. The charge in its totality correctly presented the law to the jury.

On the issue of independent intervening cause, the court charged, "[y]ou're instructed that if you find the negligence of Dr. Fegley created the risk of a particular harm, and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does

not relieve Dr. Fegley's liability from calling Dr. Malloy, except where the harm is intentionally caused by the third person, and is not within the scope of the risk created by the doctor and the hospital's conduct." The court's charge is entirely consonant with the standard of causation for intervening negligence that was proposed in 2 Restatement (Second), Torts § 442B (1965), and adopted by this court in *Mehri* v. *Becker,* 164 Conn. 516, 522, 325 A.2d 270 (1973), and *Miranti* v. *Brookside Shopping Center,* 159 Conn. 24, 28, 266 A.2d 370 (1969). The court's charge does not, as the defendants argue, make the intervenor's intentional conduct the sole determinant of the liability of the defendants. The basic test is, as the court recognized and correctly charged, whether the defendants' negligence created the risk of a particular harm, and was a substantial factor in causing that harm. In this case, if the defendants were negligent, the defendant hospital in not having rules requiring the consultation of a neurosurgeon, and the defendant physician in not asking for the consultation of a neurosurgeon, and if such negligence was a substantial factor in Kiniry's death, then the negligence of Malloy, the wrong consultant, was well within the scope of the risk created by the conduct of the defendants.

The court's further charge on causation offered the jury other grounds upon which they might find Malloy negligent and the defendants relieved of liability.[2] The court charged on proximate cause

---

[2] The court's charge to the jury included the following:

"Now, if you find that the actions which Dr. Malloy took or the actions which he failed to take were the sole proximate cause of the death of Mr. Kiniry, then I charge you that the defendants cannot be held liable to the plaintiff and in that situation you should return a verdict in favor of the defense.

"Any intervening negligence by Dr. Malloy would discharge from Dr. Fegley and/or the Danbury Hospital only if you were to find

and on superseding cause, without exception from the defendants. Those portions of the court's charge further rebut the defendants' claim that the court charged that only intentional conduct on the part of Malloy would discharge the defendants. The charge to the jury, read as a whole, fairly presented the case so that no injustice was done. *Oberempt* v. *Egri,* 176 Conn. 652, 656, 410 A.2d 482 (1979); *Kosko* v. *Kohler,* 176 Conn. 383, 390, 407 A.2d 1009 (1978).

## II

The defendants' second claim of error arises out of the court's charge on the subject of damages. In the court's initial charge on damages, the court discussed the plaintiff's right to recover compensation for loss of earning capacity. The court thereafter noted that the jury would have to deduct from this

that Dr. Malloy's negligence was the sole proximate cause of Richard Kiniry's death. The fact that Dr. Malloy's actions occurred after those of Dr. Fegley does not in and of itself constitute an independent intervening cause.

"The plaintiff claims that Dr. Fegley's notifying an orthopedist, and not notifying a neurosurgeon of Richard Kiniry's condition, together with his failure to heed Mr. Kiniry's complaints, to monitor his condition and vital signs could all be found to set in motion the chain of circumstances which led to Richard Kiniry's death.

"If you so find that Dr. Fegley's act set in motion a force resulting in further injury to Mr. Kiniry and/or created a condition which was the cause of his death and that this was a substantial factor in causing his death, then you must find for the plaintiff and against the defendant.

"Therefore, even though you might find that the defendant, Dr. Fegley, was negligent in one or more of the particulars alleged in the complaint, if you find that Dr. Fegley's negligence ceased to be a substantial factor in producing Mr. Kiniry's death and that the negligence of Dr. Malloy had so superceded that of Dr. Fegley, that Dr. Malloy, without the negligence of Dr. Fegley contributing to any material degree, was the real cause for Mr. Kiniry's death, then the negligence of Dr. Fegley would not be a proximate cause of Mr. Kiniry's death, if you find Dr. Fegley was negligent, and the defendant, Dr. Fegley, would not be liable to the plaintiff."

item an amount reflecting the decedent's projected future personal living expenses, expenses which it would be reasonably necessary for him to incur for food, shelter, clothing and health care.[3] In a supplemental charge given at the request of the plaintiff, the court charged: "With respect to damages, in any award that you may reach, you may certainly consider the effect of inflation upon your award." The defendants excepted to this recharge because the jury were not specifically instructed to consider the effect of inflation upon the expected personal living expenses of the decedent. The court refused to instruct the jury further.

Viewing the charge as a whole, we find no error in the court's instruction on inflation. The court did not, as the defendants allege, single out earning capacity as the sole element of damages to which inflation might be relevant. Its reference to "damages," without elaboration, would reasonably be understood by the jury to incorporate all of the initial charge on damages, including both lost earning capacity and expected personal living expenses. The supplemental charge and the initial

[3] The court's charge included:

"Now, you must deduct from this item the personal living expenses for damages otherwise recoverable for the loss of earning capacity. These are only his own personal living expenses. Deductions for personal living expenses include the cost at a level commensurate with the individual standard of living of food, shelter, clothing and health care, but not including recreational expenses.

"The phrase 'personal living expenses' has never been exactly defined and probably because of its nature, it never will be. It refers to those personal expenses under which the particular standard of living followed by the decedent and that you may find it would be reasonable to believe that he would follow hereafter; those or that which it would be resonably necessary for the individual to incur in order to keep him in such condition of health and well being that the individual could maintain his capacity to enjoy his life activities, including the ability to earn money to pay the expenses."

charge must be read together to see whether the charge as a whole is correct. *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857 (1972). We have never required a charge to be exhaustive or technically accurate in each of its component parts. *Hoadley* v. *University of Hartford,* 176 Conn. 669, 674, 410 A.2d 472 (1979); *Gosselin* v. *Perry,* 166 Conn. 152, 161–62, 348 A.2d 623 (1974).

## III

The defendants' third and final claim of error is that the jury's award of $1,800,000 in damages was so clearly excessive that the trial court should have set it aside or ordered a remittitur. The trial court carefully considered the defendants' motions in this regard and determined that they were unpersuasive. We agree.

The thoughtful and detailed memorandum of decision filed by the trial court judge in response to the defendants' post-trial motions puts into context[4] every aspect of the defendants' claims with regard to damages. The court rejected the defendants' argument that the verdict was motivated by publicity, passion or prejudice. During the course of the trial, the court delivered detailed cautionary instructions to the jury at least twice daily.[5] The

[4] On the issue of liability, also challenged in the post-trial motions, the judge described the evidence of the plaintiff's expert witnesses as clear, authoritative and convincing, while the evidence elicited from the defendants' experts was incredible or biased. The judge noted the failure of the defendants to call a neurosurgeon to testify in their behalf. He determined that the jury's verdict finding the defendants negligent was unimpeachable. His conclusion in that regard has not been challenged on this appeal.

[5] For example, on December 7, 1979, before the luncheon recess, the court told the jury: "Remember, don't discuss the case among yourselves or deliberate on it until you've heard all of the evidence and the court's instructions. You're forbidden to attempt to acquire any independent knowledge of the facts or the circumstances or the

defendants never objected to these instructions, nor did they request others. The defendants introduced into the record, outside of the presence of the jury, newspaper articles which they claim to have been highly prejudicial. The defendants made no showing, however, that this adverse publicity had contaminated the jury or that the trial court's instructions to the jury had in any way been violated. Lively public interest in a trial of concern to a community will frequently produce media commentary that favors one side or another; the mere existence of such commentary is not alone sufficient to support the inference that improper influences affected the verdict of the jury. See *Chandler* v. *Florida*, 449 U.S. 560, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981). On this record, the trial court was clearly not in error in determining that the jury were not shown to be influenced by publicity, passion or prejudice.

The defendants' argument that the verdict was motivated by sympathy for the plaintiff is equally unpersuasive for want of supporting evidence. We cannot assume that the verdict was tainted simply because it was delivered on December 21, in the presence of the decedent's family. The plaintiff and her children were entitled to be in the courtroom. Trials cannot be suspended in December because of unsubstantiated fears that verdicts might be affected by the generosity of the Christmas spirit.

parties in this particular case or any other case. You're limited to the evidence you hear in the courtroom and the court's instructions. Should something be broadcast, you are to ignore it; should something be displayed on television, you are to ignore it; should something be written in the local press, you are to ignore it. I told you the accuracies are highly questionable and you are limited to what you hear in the courtroom. With respect to publication on radio, a television program or in the newspaper, I'm speaking specifically about the parties, the case, the institution and the profession."

The court considered at length the defendants' attack on the verdict as grossly excessive in amount. The court had charged the jury that in their award of damages they were to be governed by General Statutes § 52-555, which provides that, in a wrongful death action, the executrix "may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses." The court described the elements of the special damages for medical and funeral costs, and the three elements of general damages: (1) compensation for conscious pain and suffering; (2) lost earning capacity less deductions for necessary living expenses, discounted for present cash value; and (3) compensation for the destruction of life's enjoyment. This is concededly the correct test.[6] *Katsetos* v. *Nolan,* 170 Conn. 637, 657, 368 A.2d 172 (1976); *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 669–71, 136 A.2d 918 (1957); *Chase* v. *Fitzgerald,* 132 Conn. 461, 470–71, 45 A.2d 789 (1946).

Because the special damages in this case were limited in amount to no more than $6500, it is clear that the major part of the jury's award of $1,800,000 must have been attributable to lost earning capacity and loss of life's enjoyment. The trial court's memorandum of decision reviewed the salient facts before the jury with regard to these elements of damages. With respect to earning capacity, the uncontested facts were that at the time of his death, in 1974, Kiniry was thirty years old, in good health, and had a life expectancy of forty-two and four-

---

[6] Except for the instruction on the effect of inflation, discussed earlier, no question has been raised before this court concerning the propriety of the trial court's charge on damages.

tenths years. He was then earning $13,000 a year as a truck driver; by the time of the trial, in 1979, he would have been earning $15,000 on the basis of contractual increments or $21,000 or $22,000 if he had switched to another location at which his employer was doing business. These figures, adjusted for the effect of inflation, could lead, the trial court found, to loss of earning capacity in an amount that "would necessarily and properly be very substantial."

The memorandum of decision also summarized the evidence that pertained to "the issue of compensation for loss of the ability to carry on all of life's activities." The evidence portrayed Kiniry as a healthy, happy, well-balanced family man. The trial court was persuaded that the jury had determined that the decedent was a person who would have continued to live a rich, full and happy life.

It is axiomatic that it is the right and the duty of the jury, as the arbiter of damages, to measure the loss of the gift of life, as well as the loss of earnings, and the other elements of damages relevant to the case before them. *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 344, 430 A.2d 1 (1980); *Angelica* v. *Fernandes,* 174 Conn. 534, 535, 391 A.2d 167 (1978); *Johnson* v. *Flammia,* 169 Conn. 491, 499, 363 A.2d 1048 (1975). Neither we nor the trial court should interfere with the jury's determination except when the verdict is so plainly excessive or exorbitant that it shocks the sense of justice because it compels the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. *Pisel* v. *Stamford Hospital,* supra, 342–43; *Thomas* v. *Katz,* 171 Conn. 412, 416, 370 A.2d 978 (1976); *Birgel* v. *Heintz,* 163 Conn. 23, 28, 301 A.2d 249 (1972); Maltbie, Conn. App. Proc. § 197. In

making our determination, this court places great weight on the ruling of the trial court in refusing to set aside the verdict as excessive. Because the trial court had an opportunity far superior to ours to evaluate the evidence and to sense the tenor of the trial, every reasonable presumption is made in favor of the correctness of its ruling; its conclusion will not be disturbed unless there is a clear abuse of discretion. *Riccio* v. *Abate,* 176 Conn. 415, 417–18, 407 A.2d 1005 (1979); *Angelica* v. *Fernandes,* supra; *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172 (1976).

In order to demonstrate that the jury's verdict was unjust, and the refusal to set it aside an abuse of discretion, the defendants rely on mathematical extrapolations which, they claim, demonstrate that the maximum recovery for the decedent's lifetime net earning capacity could not exceed $750,000.[7] Therefore, they argue, the jury must have awarded the plaintiff about $1,000,000 for the loss of life's enjoyment, and that is plainly excessive and exorbitant.

The logic of the defendants' argument is not, however, inescapable. We do not know whether their reconstruction of the jury's general verdict is accurate, for their computations were not before the jury. Neither the plaintiff nor the defendants presented expert evidence on how a dollar amount representing loss of earning capacity could be derived from the evidence of earnings and life style.

The defendants arrived at their maximum figure of $750,000 by calculating the decedent's probable gross earnings from December, 1974, to March, 1982,

---

[7] For ease of presentation, the amounts cited in the briefs have been rounded off.

on the basis of the evidence produced at the trial. They then assumed that earnings would grow at 3 percent a year from April, 1982, the expiration of the latest applicable union agreement, until the projected date of the decedent's retirement at the age of 65 in the year 2009. On this basis, they arrived at total earnings, from 1974 to 2009, of about $1,540,000. They assumed that the decedent would pay income tax at a flat rate of 30 percent, and that payment of such taxes would reduce his earning capacity to about $1,000,000. From this sum they subtracted an amount, calculated at 1.5 percent of the principal, to reflect discounted, inflation-adjusted, present value in 1974, and a further amount of some $135,000 for personal living expenses, thus arriving at a net figure of approximately $750,000.

As the plaintiff demonstrates in her brief, these calculations are only as valid as the assumptions upon which they are based. If Kiniry's earnings after 1982 would have grown at the annual rate of 5 percent rather than 3 percent, if his tax rate would have been 20 percent rather than 30 percent, then his after-tax earnings would have been more than $1,600,000. If, in addition, it is assumed that a zero percent discount rate more accurately represents the combined effect of current investment opportunities and the current rate of inflation, then the jury could reasonably have found the present value of Kiniry's net earning capacity to be in the vicinity of $1,500,000. With such a figure in mind, the total award of $1,800,000 falls within the necessarily uncertain limits of just damages. Because we have no reason to prefer the defendants' assumptions to those of the plaintiff, we must reject the argument that the jury verdict should have been set aside as

excessive. While the amount of the verdict is substantial, in a relative sense it is no more substantial than the injury sustained by the decedent. *Pisel* v. *Stamford Hospital,* supra, 344.

There is no error.

In this opinion Bogdanski and Healey, Js., concurred.

ARMENTANO, J. (dissenting). I disagree with the majority and dissent on the award of damages which is plainly excessive and exorbitant. The judgment should be set aside and the case remanded for a new trial on the issue of damages only or a remittitur should be ordered.

WRIGHT, J. (dissenting). While I agree that a plaintiff's verdict was justified in this case, in my opinion the award of damages was plainly excessive. A remittitur should be ordered.