[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff in this matter, referred to the undersigned, is the widow and administratrix of the estate of Gregory Kuczynski, a deceased police officer of the Town of Woodbridge. The complaint against the defendant, Alice G. Weimann, alleges that she was the owner of the premises located at 345 Rimmon Road on May 7, 1983; and that on said date, as a result of a call made to the Woodbridge police department, Officer Kuczynski was dispatched by that department, to check the grounds of the Weimann property, and ascertain whether a man in an automobile was trespassing thereon.
The complaint alleges that Kuczynski, while checking said premises as a police officer, was a business invitee of the defendant. And it sets out that he stepped into a hole which resulted in a "severe wrenching, snapping and/or twisting to his neck", resulting in serious neurological injuries, including "a severe bilateral headache, severe spasm of the cerebral vessels, a large aneurysm, cerebral edema, episodes of dysphasia, hemoparesis of one side of the body, a ruptured aneurysm" which led to his eventual death. It continues to allege, "that the injuries CT Page 3230 received were extremely painful and lasted up to his untimely demise." And, in Par. 9, it claims that his estate has been "depleted by his loss of earning capacity and permanent loss of life's functions." Par. 10 alleges that, as a further result of the injuries received, expenses for hospital care, doctor, x-ray, related medical expenses and funeral bills, were incurred on behalf of the decedent. Par. 11 makes various claims of negligence on the part of the defendant, which brought about the defective condition of the decedent's premises complained of.
A second count adds a claim (Par. 12) that the plaintiff's widow has been deprived of the normal aspects of her married life, which will be curtailed for the rest of her life.
In this case the defendant Weimann was represented by an attorney, who filed an appearance on her behalf, as well as an Answer to the plaintiff's complaint.
Although the defendant's attorney made a brief appearance at the trial, he did not adduce any evidence, either by way of a defendant's case, or by cross-examination of the plaintiff's witnesses. The defendant, Alice G. Weimann, likewise, did not appear at the trial.
A fellow officer in the Woodbridge police department, Walter Pecoraro, appeared at the trial and testified in behalf of the plaintiff. He brought out that both he and Officer Kuczynski had been dispatched, in separate cars, to investigate the exterior of the premises of the defendant Weimann at 345 Rimmon Road, Woodbridge, with orders to check whether a man in an automobile was trespassing thereon.
Officer Pecoraro further stated that while he and Officer Kuczynski were checking the Weimann property, he received an emergency police radio dispatch ordering him to respond to a medical emergency call, and, thereupon, he left Kuczynski on the Weimann premises.
Upon his return later that evening to the Weimann premises, he rejoined Kuczynski and noticed that he appeared pale and was rubbing the back of his neck. He inquired whether something had happened to him, and Kuczynski replied that he had tripped and caught his left leg in a large hole on the Weimann premises, causing his neck to snap back.
The plaintiff, his wife, testified that when Kuczynski arrived home, she was waiting up for him, and she observed that as soon as he entered the house he went into the bathroom, and threw up there. Upon inquiring of him, her husband told her that while walking the perimeter of the Weimann premises, he had stepped into CT Page 3231 a large hole about 12" deep, and after that his head hurt him.
Because he was complaining of a headache, the following morning, the plaintiff drove her husband to the emergency room at the St. Raphael Hospital, where he was given a checkup, and was told by the emergency room doctor that he could not find anything wrong with him. Upon his return from the hospital, he did not report for policy duty, going to bed instead, and remained there for most of the next several weeks, except for visits to doctors' offices for examinations.
The evidence indicates that he was first examined by the Woodbridge police department physician, Dr. Richard E. Kaufman, who made a diagnosis that Kuczynski was suffering from tension headaches. But because of the persistence of the headaches, Dr. Kaufman referred him for examination and diagnosis to Dr. James Sabshin, a neurosurgeon. Dr. Sabshin, apparently believed he should first be examined by a neurologist, and referred him to the office of the "Neurological Associates of New Haven," a group practice whose members are reputed to be well-qualified neurologists.
Dr. Bruce Haak of that office first performed a neurological examination of Kuczynski on May 17, 1983, and sent a report of his findings to Dr. Sabshin, in evidence as Exh. B. In this report, Dr. Haak stated that, although he had found that his findings were essentially unremarkable, he had "not excluded the possibility of a subarachnoid hemorrhage," and suggested to Kuczynski that a spinal fluid test be performed on him.
Subsequently, on May 25, 1983, Dr. Norman S. Werdiger, a neurologist colleague of Dr. Haak in the same group practice, also examined Officer Kuczynski, and sent a report of his examination to Dr. Sabshin. (Exh. F). In this report, Dr. Werdiger noted that, in the week following Dr. Haak's examination, Kuczynski's headaches had greatly increased in severity and intensity, and the patient is now "being seen urgently for it." Dr. Werdiger further set forth in his report that, because a subarachnoid hemorrhage and meningitis needed to be excluded as a causal factor, Officer Kuczynski, on this occasion (May 25, 1983), was subjected to a lumbar puncture in the doctor's office. His assessment of this examination, and based on the laboratory analysis of Kuczynski's spinal fluid, led Dr. Werdiger to conclude that Kuczynski had suffered a subarachnoid hemorrhage. In view of this finding, he forthwith arranged to have Kuczynski admitted to the St. Raphael Hospital, for admission under Dr. Haak's care.
Apparently in response to a letter from the Woodbridge police chief requesting Dr. Sabshin's opinion as to whether there was "a reasonable and probable connection between the injuries sustained CT Page 3232 by Officer Kucnnski on May 7, 1983 and his subsequent death on May 30, 1983," Dr. Sabshin sent the chief a report, dated June 8, 1983, in evidence as Exhibit C. This post-death report (Exh. C) relates that Officer Kucnnski was admitted to St. Raphael's Hospital for a lumbar puncture (performed by Dr. Werdiger) which revealed findings consistent with a subarachnoid hemorrhage. Dr. Sabshin further amplified in Exhibit C that "cerebral angiography revealed a large aneurysm and severe spasm of the cerebral vessels on the side of the aneurysm. Additionally he also had evidence prior to his death of continuing spasm of the cerebral vessels and cerebral edema, including episodes of dysphasia, which is a loss of language capabilities and also hemiparesis or weakness of one side of his body. These findings precluded a safe, early surgery and clipping and [elimination] of his aneurysm."
Discussing the history he received from Officer Kuczynski, Dr. Sabshin, elucidated in this report that "[t]he first hint of any type of subarachnoid hemorrhage secondary to his aneurysm bleeding occurred approximately 10:30 [P.M.] on May 7, 1983 while he was on duty. He told me at that time he stepped into a hole in the road and basically tripped and although he did not have any blow to the head at that time he had the sudden onset of bilateral severe headache described as the worst headache he had ever had and also a stiff neck. It would seem clear to me that this injury precipitated the rupture of his aneurysm. This also just as clearly led to his further and subsequent neurological problems and eventual demise."
Dr. Arthur M. Seigel, a fellow neurologist in Neurological Associates of New Haven, P.C. with Dr. Haak and Dr. Werdiger, filed a "Discharge Summary" at the Hospital of St. Raphael, dated May 31, 1983, which is in evidence as Exhibit K. This recapitulates essentially the identical history of the deceased and the treatment he received from May 7, 1983 to his demise on May 30, 1983 in the St. Raphael Hospital.
The most impressive and convincing expert medical opinion testimony was that given at the trial herein by Dr. James Sabshin, the neurosurgeon. In that testimony he correlated the history of Kuczynski catching his foot in a deep hole on the defendant Weimann's grounds, with the injury sustained by him in suffering a severe wrenching of his neck, leading up to the onset of the persistent headaches and his untimely demise.
Dr. Sabshin related in court that he first saw Officer Kuczynski on May 13, 1983, through a referral from Dr. Kaufman, the Woodbridge police department physician. His testimony brought out that Officer Kuczynski stated to him that around 10:30 P.M., while on duty checking out the Weimann premises, he stepped into a hole, and that later that night he suffered nausea and dizziness. CT Page 3233 He examined Kuczynski and found that his condition was essentially normal, although the officer complained of a stiff neck. He later saw Kucynski at the St. Raphael Hospital where a "cat scan" of the head was performed, which, also, was essentially normal. On May 16, 1983 the officer came to Dr. Sabshin's office complaining of a severe headache, but stated he did not have any stiffness of the neck. He decided to refer Kuczynski for a neurological examination, and, as set out hereinabove, Kuczynski was first examined by Dr. Bruce Haak who sent a report to Dr. Sabshin (Exh. B), and later by a colleague in the same office, Dr. Norman S. Werdiger, who also sent a report to Dr. Sabshin. (Exh. F).
All the medical experts involved in the treatment of Officer Kuczynski, appear to concur with the "Discharge Summary" (Exh. K), signed by Dr. Arthur Seigel, stating that Officer Kuczynski, died of a "subarachnoid hemorrhage secondary to [a] ruptured intracranial aneurysm." Finding of Facts
In formulating a Finding of Facts herein, the undersigned fully recognizes that he is confronted by a paucity of evidence adduced at the trial — aside from the medical testimony and reports of the medical experts. The evidence as to the physical condition of the exterior grounds of the defendant's property, where the complaint alleges that Officer Kuczynski tripped in a deep hole on May 7, 1983, is limited, and in the main, is circumstantial.
1) It is clear that neither Officer Pecoraro, nor the plaintiff wife, actually saw the hole involved in Kuczynski's fall.
2) The duty of a possessor of land toward a business invitee is succinctly set forth in Warren v. Stancliff, 157 Conn. 216, 217
(1968). The quotation below appears pertinent to the instant situation, that:
 "A possessor of land is charged with constructive notice of a dangerous condition when it is of such a nature and duration that a reasonable inspection would have disclosed the risk. White v. E F Construction Co., 151 Conn. 110, 113, 193 A.2d 716; Phenning v. Silansky, 144 Conn. 223, 226, 129 A.2d 224. Constructive notice is premised on the policy determination that under certain circumstances a person should be treated as if he had actual knowledge so that one should not be permitted to deny knowledge when he is acting so as to keep himself ignorant. 39 Am.Jur. 236, Notice, 7. CT Page 3234 Therefore, when a possessor of land fails to make or to have made a reasonable inspection which would have disclosed the dangerous condition, his negligent ignorance is, in the eyes of the law, equivalent to actual knowledge."
3) The undersigned trier, therefore, finds that the defendant owner, Alice G. Weimann, had constructive notice of the dangerous existence of the deep hole, approximately twelve inches deep, on the exterior grounds of her property at 345 Riunon Road in Woodbridge, on May 7, 1983.
4) The plaintiff tripped in said deep hole on the night of May 7, 1983, at approximately 10:30 P.M., and suffered the injuries described hereinabove.
5) There was a direct causal connection between the injuries received and his ultimate demise on May 30, 1983.
6) The defendant owner, Weimann, owed a duty to Officer Kuczynski as a policeman-business invitee on her property, to keep the exterior of her property grounds in a reasonably safe condition.
7) She was charged with constructive notice of the existence of the deep hole involved, and that it was a dangerous and unsafe condition, which caused Officer Kuczynski to trip therein, snapping his neck back, and so became injured as delineated hereinabove.
8) The subsequent early sequel to the injuries sustained by Kuczynski was his untimely demise on May 30, 1983, all as a direct causal result of the fall on the defendant's property.
Conclusions
1) The evidence presented, although circumstantial, is based on inferences that may properly be drawn. "Triers of fact must often reasonably rely on circumstantial evidence and draw inferences from it." See Cayer v. Salvatore, 150 Conn. 361, 363.
2) This decision further brings out, p. 364, that proof by circumstantial evidence "need not be so conclusive that it precludes every other hypothesis."
3) It is sufficient if the proof produces in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact to be inferred is true." CT Page 3235
4) The drawing of inferences is further elucidated in State v. Gonski, 155 Conn. 463 (1967), where, at p. 468, it states a "trier may base one inference on facts it finds as a result of other inferences."
5) And, State v. Gonski, supra, observes that the "applicable test is not that the inferences must unavoidably and unerringly point in one direction, but, rather, whether the rational mind could with reasonableness draw the inference."
6) Cayer v. Salvatore, supra, is also relevant in its factual situation, since, in that case, there was no witness who actually witnessed the operation of the vehicle involved nor its speed at the time it "ran off the road head on into the tree."
7) That decision amplifies that, although the defendant operator of the vehicle at the time of the collision was in the courtroom during the trial, he did not testify, and the evidence adduced was solely through the plaintiff.
8) And, at p. 365, Cayer v. Salvatore, supra, emphasizes that "although the plaintiff's case was weak, it was a prima facie one, and the failure of the defendant [operator] Joseph to testify personally, permitted the inference that his testimony would be unfavorable, and that he was negligent."
9) The undersigned concludes that the most compelling and convincing evidence was adduced through Dr. James Sabshin, the neurosurgeon member of the highly respected Neurosurgical Associates of New Haven, a group practice, through his report to the Woodbridge police department, dated June 8, 1983 (Exh. C), and his testimony at the trial.
10) He testified that he received a history from Kuczynski, when he first examined him a few days after May 7, 1983, that he had caught his foot in a hole on the exterior of the premises (of the defendant, Weimann), and that he had sustained a severe wrenching of his neck.
11) His expert opinion on the witness stand was clear, positive and authoritative that that there was a causal connection between Kucnnyski's tripping into the hole and the injuries he sustained, leading up to his untimely death on May 30, 1989.
12) The histories that the neurologists Dr. Bruce Haak and Dr. Norman Werdiger, who examined Kuczynski at the behest of Dr. Sabshin, received from him were essentially the same as to Kuczynski's tripping in the hole on the defendant's property and the subsequent injuries he sustained. CT Page 3236
13) The expert opinion of all the doctors who examined and participated in the treatment of Officer Kuczynski was that Kuczynski sustained a subarachnoid hemorrhage secondary to an aneurysm, and the undersigned so concludes.
14) The evidence as a whole, including that of circumstantial evidence and the drawing of the inferences of fact set out, support the factual conclusion that the "plaintiff has proven actionable negligence within the purview of the specifications of negligence" set out in the complaint. See Andrea v. New York, N.H. H.R. Co., 144 Conn. 340, 346.
15) This trial court is entitled to consider the evidence from the point of view most favorable to the plaintiff, cognizant of the fact that the defendant has not seen fit to present any evidence. Cayer v. Salvatore, pp. 303, 304, 305. It may be noted that the exposition of the role circumstantial evidence plays, as set forth above in Cayer, supra, is approved in the later decision of Boehm v. Kish, 201 Conn. 388, 389 (1986), and Puro v. Henry,188 Conn. 301, 310 (1982).
In summation, therefore, the undersigned concludes that the defendant owner, Alice G. Weimann, was charged with constructive notice of the dangerous existence of the hole in issue for an extended period of time. And she is legally responsible, in the instant matter, for the injuries and subsequent death of Officer Kuczynski, and for the damages assessable for his wrongful death.
Although the plaintiff has presented a skeleton, prima facie case, both as to liability and the damages claimed in this action, there was sufficient evidence presented by the plaintiff to establish, by a fair preponderance of the evidence, that the defendant is liable or the injuries and resultant death of Officer Kuczynski, particularly in view of the defendant's complete failure to adduce any counter-availing evidence to refute the plaintiff's case.
Judgment Damages
The law as to the elements of damage which a plaintiff in a wrongful death case may claim, is succinctly set out in the case of Katsetos v. Nolan, 170 Conn. 637, 657 (1976), as follows:
 "In actions for injuries resulting in death, a plaintiff is entitled to `just damages together with the cost of reasonable necessary medical, hospital and nursing services, and including funeral expenses.' General Statutes 52-555. `Just damages' include (1) the value of the decedent's lost earning capacity less CT Page 3237 deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering. Chase v. Fitzgerald, supra, 470-71; Floyd v. Fruit Industries, Inc., 144 Conn. 659, 669-71, 136 A.2d 918; see Feldman v. Allegheny Airlines, Inc., 524 F.2d 384 (2d Cir.). It has been stated that our rule for assessing damages in death cases gives no precise mathematical formulas for the jury to apply; Floyd v. Fruit Industries, Inc., supra, 676; Szela v. Johnson Motor Lines, Inc., 145 Conn. 714, 718, 146 A.2d 910; Lane v. United Electric Light Water Co., 90 Conn. 34, 37, 96 A. 155; and that the assessment of damages in wrongful death actions `must of necessity represent a crude monetary forecast of how the decedent's life would have evolved."'
It is apparent that the assessment of the special damages of the "necessary medical, hospital and funeral expenses" are the most susceptible of easy ascertainment, and have been correctly itemized in the plaintiff's legal memorandum, as established in the evidence. The medical bills total $6,599.95, and the funeral bill (Exh. N) $2,767.62.
The determination of a justifiable amount for the award of "just" damages, presents a much more difficult task, particularly because the plaintiff did not adduce any evidence dealing with damages for the economic loss to his estate awardable over the length of Kuczynski's life expectancy period. This trier must take cognizance also of the holdings of our Supreme Court that "the loss of life's enjoyments is compensable in wrongful death actions." Mather v. Griffin Hospital, 207 Conn. 125, 139 (1988).
The plaintiff-administratrix is entitled to receive, as part of an award of damages, an evaluation of the value of the destruction of her decedent husband's earning capacity. And dealing with this element of damages, account must be taken of his life expectancy, which based on his date of birth, May 9, 1946, amounted to 36.78 years, as set out in the life mortality table.
As of May 7, 1983, the date of his decease, he was earning a gross salary of $424.20 per week, as a Woodbridge police officer, Exh. L, amounting to an annual gross salary of $22,058.00. Assuming he would be retired as a policeman at age 60, he would CT Page 3238 have a working life-expectancy span of approximately 23 years. Multiplying the $22,058.00 annual loss of earnings, by a 23 year period of loss of earnings, would give a total of $507,334.00.
However, our Supreme Court decisions make clear that the total gross amount of the earnings figure must be reduced to reflect payment of federal income taxes. Kiniry, supra, p. 463. The Kiniry decision, supra, p. 463, points out further an additional amount would still have to be deducted "to reflect discounted inflation adjusted present value [in 1990]." Moreover, Kiniry, supra, explained that an additional amount also would have to be deducted to account for the decedent's living expenses, including food, shelter, clothing and health care, during the life expectancy period from 1983 to 2006 (its end period). Subtracting these elements of deductions would have to be balanced against increments of increases in annual salary. The reconciliation of these elements give a net loss of earnings figure.
But, in contrast to the detailed expert actuarial and economic evidence adduced in Kiniry, supra, no evidence whatever of this nature was introduced herein.
For guidance in formulating a decision herein, the undersigned has examined in depth the appeal record on the Kiniry v. Danbury Hospital, 183 Conn. 448 (1981) case, which appears in Vol. A-758, Part 2, G-P, January term 1981. This is a leading wrongful death action against the hospital and one of its doctors who treated the decedent Kiniry, alleging malpractice resulting in his death. The large verdict of $1,800,000.00 was sustained on appeal. The appeal emphasizes how complicated the arrival at a figure for "just damages" in a wrongful death case can be, because of the various elements required to be considered. That record shows that counsel presented voluminous economic and actuarial expert testimony as to how the effects of inflation over a period of years should be considered as it relates to damages awardable for loss of decedent's earning capacity.
The trial judge instructed the jury that it would have to deduct from this element of damages "an amount reflecting the decedent's protected future living expenses which it would be reasonably necessary for him to incur for food, shelter, clothing and health care. And in making an award, the effect of inflation should be considered.
The Kiniry decision, p. 461, makes clear that the trier — be it the jury or judge (as herein) — as the arbiter of damages, has the duty to measure the loss of the gift of life, as well as the loss of earnings and the other elements of damage relevant to the case being tried. CT Page 3239
The Kiniry case required nine weeks of trial (Record, p. 2, Counterstatement of Plaintiff's Attorney), whereas the instant matter was tried in approximately two days.
Because of the lack of expert evidence as to the elements of economic loss, the trier herein has no "means of determining to what extent inflation and the depreciated dollar may or should be taken into account, beyond a mere assumption that inflation has existed for some considerable period of time. (Kiniry, supra).
The undersigned trier accepts the fact the deceased Kuczynski was 37 years of age at the time of his decease, and therefore, he had a life expectancy of approximately 36.78 years (Exh. D). The plaintiff wife-administratrix testified at the trial that she and her deceased husband enjoyed a very happy marriage. The deceased was a big man, over six feet tall, and was a dedicated father of their four children, and head of a congenial household.
The undersigned has carefully considered the evidence adduced by the plaintiff in this skeleton prima facie case, and after due consideration awards "just damages" as follows:
 1) Special damages for medical and hospital expenses, $6,599.95, and $2,767.62 for funeral expenses are awarded, making a total of $9,368.00 (rounded).
 2) For conscious pain and suffering during the period from May 7, 1983 to May 30, 1983, caused by the severe headaches the plaintiff was experiencing, $10,000.00.
 3) As compensation for the destruction of life's enjoyment by the deceased, $100,000.00.
 4) The award of damages for loss of earning capacity, less required deductions for necessary earning expenses and discounted for present cash value, presents the most difficult element in the formulation of this decision. The decision of our Supreme Court makes clear, however, ". . . that proof equivalent to a mathematical demonstration is not required" and ". . . that the only requirement is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier to make a fair and reasonable estimate." Hoadley v. University of Hartford, 176 Conn. 669, 675
(1979).
 The undersigned is aware that it is quite probable that the decedent police officer, Kuczynski, had a loss of earning capacity in an amount that would "necessarily and properly be very substantial." Kiniry, supra, p. 461. He CT Page 3240 therefore, reaches the conclusion that $400,000.00 would be a reasonable and just amount for this element of damages.
In summation, adding the amounts set out in the four categories of damages, the trier concludes that damages in this case of $520,000.00 would be fair and just.
Accordingly, judgment under the First Count of the Complaint is entered herein in favor of the plaintiff-administratrix to receive damages of $520,000.00 from the plaintiff.
No award of damages is made under the Second Count of the Complaint.
So Ordered.
A. Frederick Mignone State Trial Referee