[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM RE: MOTION TO SET ASIDE VERDICT AND/OR FOR REMITTITUR #140
On April 29, 1993 the plaintiff K. Ellen Mullane received a verdict in the amount of $344,000.00 as follows:
Economic Damages $ 50,000.00
 Non-Economic Damages 378,000.00 ------------ Total $ 428,000.00
Contributory negligence 20%
Net Recovery $ 344,000.00
On April 30, 1993, the defendant filed a motion to set aside the verdict and/or for remittitur. Initially, the court notes that based upon 20% contributory negligence the net verdict should be $342,400.00 rather than $344,000.00. Accordingly, the verdict must initially be reduced by $1,600.00. In addition, the parties have agreed to a reduction of $9,268.87 based upon 80% of $11,586.09 for collateral source.
There was evidence before the jury to find that Mrs. Mullane is a teacher of the Holy Infant Nursery School located at St. Francis Parish Center in New Milford. On November 18, 1991, at approximately 12:45 p.m., as she was driving her car out of the parking lot on her way home, she observed that an elderly woman was having difficulty parking her car. Mrs. Mullane offered to park the car for her, at which time, the elderly woman, who turned out to be Mildred F. Knudsen, started to get out of the car at which time the car started to roll. Mrs. Mullane reached for the emergency brake and told Mrs. Knudsen to put her foot on the brake pedal. Instead of putting her foot on the brake pedal, Mrs. Knudsen put her foot on the gas pedal. The plaintiff was caught between the open door and the car itself and was dragged along the ground with her head bouncing up and down, fearing that the car would collide with the school building or that the car would drive over her upper body. CT Page 5413 All of a sudden, the car swerved to the right and the plaintiff was released and landed on the road. The Knudsen vehicle turned to the right, continued forward in the parking area, collided with a parked vehicle, again turned to her right, struck and went threw a wire fence and travelled into a playground area coming to rest on a swingset.
There was ample evidence for the jury to find negligence on the part of the defendant. The plaintiff alleged a failure to keep her vehicle under proper control and to set its brakes to secure it in a stationary position. See Kosinski v. Kosinski, 118 Conn. 701. In reviewing claims concerning the sufficiency of the evidence, the court construes the evidence in the light most favorable to sustaining the verdict. Buckman v. People Express, Inc., 205 Conn. 166, 175. A verdict cannot be disturbed unless it is against the evidence or its manifest injustice is so plain as to justify the belief that the jury or some of its members were influenced by ignorance, prejudice, corruption or partiality. Frankovitch v. Burton, 185 Conn. 14, 16. In this case, it would be an abuse of discretion for the court to upset the verdict on liability. The jury carefully considered the evidence as indicated by its finding of 20% contributory negligence.
The plaintiff was transported by New Milford ambulance to the New Milford Hospital where she was examined and treated in the emergency room. She was seen by Dr. Kamm on Friday, November 22nd. At that time, she had pain in her left shoulder and left knee, left ankle, abrasions of the left foot. On January 7, 1992, Mrs. Mullane consulted Dr. Anthony Viola in New Milford at which time her most striking complaint was in her neck and C spine area. She was having difficulties at work. Between the date of the accident and January 7, 1992, the plaintiff claimed to suffer continued pain and discomfort in her left shoulder, left knee and increasing discomfort in her cervical back and C spine area.
She continued to have difficulties reading and doing desk work and was also suffering pain in her left shoulder. She demonstrated difficulty reaching backward and complained of considerable pain in the left shoulder at night. She also complained of some continuing pain in her right knee and to a lesser extent, in her left knee, had a contused right hand, had pain and swelling in the first web space near the base of the thumb and near the wrist.
On exam, she had definite crepitation and pain with abduction and external rotation in her left shoulder. She had tenderness in the right hand and tenderness in the right knee. An x-ray of the C spine performed at that time showed that the plaintiff had a severe reversal of her CT Page 5414 cervical lordosis and that there was associated degenerative disc disease and osteophyte formation at C5-6, which had become symptomatic as a result of the accident.
Dr. Viola diagnosed the plaintiff based on that exam as having:
1) a cervical sprain/strain with underlying degenerative disc disease at C5-6 and severe loss of her cervical lordosis;
2) post traumatic impingement syndrome of her left shoulder with a probable rotator-cuff tendonitis;
3) lumbosacral sprain/strain;
4) right knee sprain/contusion probably a sprain of the medial collateral ligament and medial meniscus;
5) right hand contusion and wrist sprain with improvement.
At that time she was placed by Dr. Viola in a cervical collar and placed on Motrin for pain. She was also given exercises for her neck, shoulder, back and knees.
By late winter and into the spring of 1992, her knee and hand areas had improved but her back, neck and shoulder continued to be symptomatic to her. She was feeling that the pain in her neck was worse and that the left shoulder pain was essentially the same. She was also placed on Naprosyn for pain and commenced a course of physical therapy which helped her cervical neck pain. She was administered a cortisone injection by Dr. Viola during the March 3rd office visit. By April 14th, she was continuing to have severe pain in her shoulder and increasing pain in her neck. She underwent an MRI of the left shoulder and C spine. The C spine MRI showed a loss of the lordosis, advanced degenerative disc disease at C3 to C6 and a Grade I retrospondylolisthesis of C5 and C6 felt to be on a degenerative basis. She was diagnosed on April 14th as having post traumatic impingement syndrome of the left shoulder with no rotator cuff tear and cervical strain/sprain exacerbating an underlying degenerative disc disease with loss of cervical lordosis.
The plaintiff underwent an arthroscopic surgical procedure of the left shoulder involving a subacromial bursectomy and release of coracoacromial ligament along with an abrasion acromioplasty on May 18, 1992.
This procedure was successful in increasing the mobility of her CT Page 5415 shoulder and she has gradually regained shoulder function with the assistance of physical therapy which began on May 27th. The plaintiff was then seen by Dr. Alan Balasic of New Milford, Connecticut on September 30, 1992, at which time she was continuing to complain of neck and shoulder pain, occasional pain radiating down the proximal aspect of her right lateral arm and occasional pain in her middle finger.
Prior to that, she had been evaluated by Dr. Henry R. Gossling on August 27, 1992, at UConn School of Medicine, at which time Dr. Gossling opined that the plaintiff had an unstable C3-4 segment representing a significant spine injury which required prompt orthopedic attention with writing and fusion procedure.
Dr. Balasic reviewed the x-rays taken upon Dr. Gossling's review of the plaintiff, finding significant cervical spondylosis with a lordotic curvature reversal noted at C4. He also noted a narrowed disc space predominantly at C5-6 and to a lesser extent C4-5 and C6-7. These were also noted on the MRI scan which was reviewed by Dr. Balasic.
Dr. Balasic testified that Mrs. Mullane had multilevel cervical spondylosis involving C3-4 through C6-7, most prominent at C5; combined hard/soft disc herniations by MRI scans most notable at C5-6, and to a lesser degree C6-7; mild retrolisthesis of C5 on C6, degenerative in nature; and lordotic curve reversal of the cervical spine as described above. He further opined that the plaintiff had multilevel cervical disease on a degenerative basis which was symptomatically aggravated as a result of her accident on November 18. 1991. The plaintiff was referred to Dr. Michael J. Murphy whom she saw for an evaluation on October 26, 1992. At that time, the plaintiff still complained of having neck pain which was getting worse. The pain was primarily on the right side of her neck and radiated both into the occipital area and into the right trapezius area.
Upon review of the x-rays generated on August 7, 1992, Dr. Murphy concluded that these demonstrated decreased disc space at C4-5, C5-6 and C6-7. He also found an angular deformity between C3 and C4, measuring greater than 11 percent, suggestive of sub-clinical instability by the criteria of White and Panjabi. He also felt that the MRI scan of April 6, 1992, demonstrated a mild retrolisthesis of C5 on C6 with an associated bulge or mild herniation of C5-6 disc.
Based on the above, Dr. Murphy concluded that the plaintiff has multiple problems of her cervical spine and felt that she did have some subclinical instability at C3-4, as well as some degenerative disc CT Page 5416 disease and probable mild herniation at C5-6 and to a lesser extent at C6-7. He did not recommend immediate surgery but recommended that she try a course of vigorous neck strengthening exercises prior to considering any surgical intervention.
The plaintiff's condition at trial was that she is extremely limited in her activities. She attempts to do her school teaching activities but experiences frequent painful episodes while she is moving about the classroom and doing the physical labors incident to teaching. She also experiences pain and discomfort when she is doing normal household duties such as laundry, lifting, vacuuming, etc. Mrs. Mullane testified to continuing discomfort which precludes her from engaging in any kind of strenuous physical activity.
Dr. Balasic testified that in his opinion she will require a cervical interbody fusion of her neck at C5-6 and C6-7. The cost of such a procedure will be between $20,000.00 and $25,000.00. At the present time, the plaintiff is resisting an operation but in the opinion of the doctor, it will be necessary sometime in the future.
The medical bills submitted in evidence without objection are as follows:
PROVIDER TOTAL — ------ -----
Dr. Viola $ 6,346.00
Danbury Hospital 1,300.00
Danbury Radiological Assoc. 578.00
CVS Pharmacy 153.59
N.M. Anesthesia Assoc. 825.00
New Milford Hospital 6,705.62
New Milford Medical Group 270.00
Dr. Puglia 230.00
University Physicians 205.00
John Dempsey Hospital 266.00 CT Page 5417
Dr. Murphy 315.00
Dr. Balasic 525.00
Romanowski-Physical therapy 880.00
Dr. Gellella 5,185.00 ---------- Total $23,784.21
As previously noted, the jury awarded economic damages of $50,000.00. Based upon the testimony of Dr. Balasic the maximum that the jury could have awarded for a future operation is $25,000.00 or a total of $48,784.21. The court finds that since the plaintiff is reluctant to have the operation at this time and that an award for this procedure may accumulate interest, $20,000.00 is a more reasonable award. Accordingly, the court finds that the economic damages must be reduced to $43,784.21 or a reduction of $6,215.79.
The award of $478,000.00 for non-economic damages reduced by 20% is generous but not one which shocks the court's sense of justice. Kiniry v. Danbury Hospital, 183 Conn. 448, 461. The plaintiff has an average life expectancy of 31.1 years. The permanent partial disability to her neck is 15% to 20% and 10%-12% of her whole body. She sustained an injury to her teeth as well as considerable pain and suffering. The defendant had the opportunity to accept the plaintiff's offer of judgment of $100,000.00. She declined to do so but rather chose to litigate liability and charges. Having chosen that course, the defendant is bound by the jury's determination.
The defendant raises two issues in argument: the admission of Dr. Viola's written report even though he testified and her acceptance of the plaintiff's offer of judgment after the verdict.
Section 52-174 provides in pertinent part:
 (b) In all actions for the recovery of damages for personal injuries or death, . . . any party offering in evidence a signed report and bill for treatment of any treating physician, . . . may have the report and bill admitted into evidence as a business entry and it shall be presumed that the signature on the report is that of the treating physician, . . . and that the report and bill were made in the ordinary course of business. The use of any such report or bill in lieu of the testimony of such treating physician, . . . shall not CT Page 5418 give rise to any adverse inference concerning the testimony or lack of testimony of such treating physician. . . .
 (c) This section shall not be construed as prohibiting either party or the court from calling the treating physician, . . . as a witness.
There is nothing in this statute that limits the right to offer the report in evidence. It unequivocally states that the party offering the report "may have the report . . . admitted into evidence as a business entry. . . ." It also provides for the calling of the physician as a witness. Clearly, had the report been offered and later the doctor was called, the jury would have both the report and oral testimony. The court finds no basis to fashion an exemption not set forth in the statute. Local 218 Steamfitters Welfare Fund v. Cobra Pipe Supply Coil Co.,207 Conn. 639, 645.
The defendant's final claim is that by accepting on May 14, 1993 the plaintiff's offer of judgment of $100,000.00 of April 21, 1993, a judgment must enter for that amount.
 Sec. 52-192a. Offer of judgment by plaintiff. Acceptance by defendant. Computation of interest. (2) After commencement of any civil action based upon contract or seeking the recovery of money damages . . . the plaintiff may before trial file with the clerk of the court a written `offer of judgment' signed by him or his attorney, directed to the defendant or his attorney, offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of the offer of settlement to the defendant's attorney, or if the defendant is not represented by an attorney, to the defendant himself. Within thirty days after being notified of the filing of the `offer of judgment', the defendant or his attorney may file with the clerk of the court a written `acceptance of judgment' agreeing to a stipulation for judgment as contained in plaintiff's `offer of judgment'. . . . . If the `offer of judgment' is not accepted within thirty days, the `offer of judgment' shall be considered rejected and not subject to acceptance unless refiled. Any such `offer of judgment' and any `acceptance of offer of judgment' shall be included by the clerk in the record of the case.
 (b) After trial the court shall examine the record to determine whether the plaintiff made an `offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in his `offer of judgment', the court shall add to CT Page 5419 the amount so recovered twelve per cent annual interest on said amount, computed from the date such offer was filed in actions commenced before October 1, 1981. In those actions commenced on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the `offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the `offer of judgment' was filed. . . . (Emphasis added)
The defendant claims that she has thirty days from April 21, 1993 to accept the plaintiff's offer of judgment. This claim overlooks the plain meaning of subsection (b) which directs the court to examine the file "after trial." "Trial" has been defined as, "A judicial examination and determination of issues between parties to action . . . whether they be issues of law or of fact, . . . . A judicial examination, in accordance with law of the land, of a cause, either civil or criminal, of the issues between the parties, whether of law or fact, before a court that has proper jurisdiction." Black's Law Dictionary, 5th Ed.
In this case the trial was concluded when the court accepted the verdict. At that point, the jury was discharged and all that remained was post verdict motions. The defendant's claim overlooks the purpose of52-192a which is to ". . . provide an incentive for both parties to bargain reasonably and in good faith and to settle close cases . . . thereby reducing the delay in civil jury cases. . . [T]his type of legislation would hopefully . . . unclog the congested docket [citation omitted]." Verrastro v. Sivertsen, 188 Conn. 213, at 223. To construe the statute so as to give a cap on a verdict for a defendant would be contrary to the legislative intent and contrary to its express directive to examine the file "after trial."
In summary, the court finds that the verdict as to liability was in accord with the evidence before the jury and therefore the motion to set aside is denied. On the issue of damages, a remittitur of $7,815.79 shall be filed within ten days or a new trial ordered. Assuming the remittitur is filed the plaintiff's damages shall be $334,584.21, less $9,268.87 or $325,315.34. To that must be added interest at the rate of 12% from June 1, 1992, totaling 333 days at $106.95 per diem for a total of $35,614.35, making the final amount $360,929.69.
PICKETT, J. CT Page 5420