Carol L. Birgel et al. *v.* Howard T. Heintz et al.

House, C. J., Ryan, Shapiro, Loiselle and FitzGerald, Js.

Argued March 8—decided April 19, 1972

*Peter M. Ryan,* with whom was *Joseph J. Rucci, Jr.,* for the appellant (named plaintiff).

*Noel R. Newman,* with whom, on the brief, was *Edgar W. Krentzman,* for the appellees (defendants).

SHAPIRO, J. On August 3, 1968, an automobile owned by the defendant Howard T. Heintz and operated by his son the defendant John T. Heintz left the traveled portion of the Merritt Parkway in the town of New Canaan and struck a concrete bridge abutment. A passenger in the vehicle, Carol Linda Birgel, hereinafter referred to as the plaintiff, then

twenty years old, was severely injured. A suit in her behalf was instituted by her father Henry T. Birgel against the defendants for damages for her injuries. The father in his own behalf also sought to recover as damages the medical expenses which he had incurred on behalf of his daughter. The action was tried to a jury which returned a verdict for $22,500 in favor of the plaintiff and for $5309.41 in favor of her father. The plaintiff moved to set aside the verdict on the ground that it was inadequate. The court denied the motion and only the plaintiff has appealed from the judgment rendered therein.[1]

The only assignments of error pursued by the plaintiff in argument before us relate to the claims that the court erred in its refusal to set aside the verdict as inadequate and in its ruling on the admission of evidence.

The judgment from which the plaintiff appeals reflects the recovery for her as shown in the verdict. The verdict rendered in favor of the plaintiff was predicated on her claim for damages for injuries sustained by her and for those medical expenses incurred by her since she reached the age of twenty-one, as well as for her claims regarding the future. Her claim for damages was so presented by the court in its charge to the jury. While the amended complaint does not properly raise the plaintiff's claim for damages, the parties have treated the issue as did the court. This is clearly demonstrated by the fact that no exception was taken by the defendants to the jury charge, to the form of the ver-

---

[1] The father has not appealed from the judgment in his favor for an amount that is exactly the sum claimed for expenses incurred by him until the plaintiff reached the age of twenty-one. This was in accord with the court's charge to the jury.

dict or the form of the judgment. We shall, therefore, follow the parties in this regard. Maltbie, Conn. App. Proc. § 42.

In recent cases we have had frequent occasion to repeat the considerations which must govern our decision in an appeal such as that before us where the claim is that the jury award is inadequate. See *Bates* v. *Frinder,* 161 Conn. 566, 287 A.2d 739; *Rood* v. *Russo,* 161 Conn. 1, 3, 283 A.2d 220; *Jerz* v. *Humphrey,* 160 Conn. 219, 276 A.2d 884; *Marin* v. *Silva,* 156 Conn. 321, 240 A.2d 909, and cases cited. In reviewing the action of the trial court on a motion to set aside a verdict, our primary concern is to determine whether the court abused its discretion and whether, on the evidence presented, the jury could fairly reach the conclusion they did. *Rood* v. *Russo,* supra; *Marin* v. *Silva,* supra, 323; *Desmarais* v. *Pinto,* 147 Conn. 109, 110, 157 A.2d 596; *Butler* v. *Steck,* 146 Conn. 114, 117, 148 A.2d 246; *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.,* 143 Conn. 468, 474, 123 A.2d 760; *McWilliams* v. *American Fidelity Co.,* 140 Conn. 572, 575, 102 A.2d 345; *Prosser* v. *Richman,* 133 Conn. 253, 256, 50 A.2d 85.

On appeal we determine on the evidence presented in the appendices whether the trial court, in exercising its large discretion, could legally act as it did, and not whether we, on the same evidence, would make the same ruling. *Pischitto* v. *Waldron,* 147 Conn. 171, 175, 158 A.2d 168; *Butler* v. *Steck,* supra, 119. From the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than we can, on the printed record, what factors, if any, could have improperly influenced the jury. *Zullo* v. *Zullo,* 138 Conn. 712, 715, 89 A.2d 216; *State* v. *Hayes,* 127 Conn. 543, 554, 18 A.2d 895; *Loomis* v. *Perkins,* 70

Conn. 444, 447, 39 A. 797. We cannot disturb the decision of the trial court unless there are "considerations of the most persuasive character." *Mulcahy* v. *Larson,* 130 Conn. 112, 114, 32 A.2d 161; *Hauk* v. *Zimmerman,* 135 Conn. 259, 261, 63 A.2d 146.

" 'In passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. The juror must use all his experience, his knowledge of human nature, his knowledge of human events, past and present, his knowledge of the motives which influence and control human action, and test the evidence in the case according to such knowledge and render his verdict accordingly. . . . The trial judge in considering the verdict must do the same . . . and if, in the exercise of all his knowledge from this source, he finds the verdict to be so clearly against the weight of the evidence in the case as to indicate that the jury did not correctly apply the law to the facts in evidence in the case, or were governed by ignorance, prejudice, corruption or partiality, then it is his duty to set aside that verdict and to grant a new trial.' . . . [*Howe* v. *Raymond,* 74 Conn. 68, 71, 49 A. 854]; *Cables* v. *Bristol Water Co.,* 86 Conn. 223, 224, 84 A. 928; *Capital Traction Co.* v. *Hof,* 174 U.S. 1, 13, 19 S. Ct. 580, 43 L. Ed. 873; see *Bissell* v. *Dickerson,* 64 Conn. 61, 29 A. 226. The trial judge has a broad legal discretion and his action will not be disturbed unless there is a clear abuse. *Allen* v. *Giuliano,* 144 Conn. 573, 578, 135 A.2d 904; *Slabinski* v. *Dix,* 138 Conn. 625, 628, 88 A.2d 115; *Brower* v. *Perkins,* 135 Conn. 675, 681, 68 A.2d 146; *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 20, 96 A. 169; *Loomis* v. *Perkins,* 70 Conn. 444, 447, 39 A. 797; Maltbie, Conn. App. Proc., §§ 187, 196." *Butler* v. *Steck,* supra, 116–17; cited with approval, *Marin* v.

*Silva,* supra, 326–27. A mere doubt of the adequacy of the verdict is an insufficient basis for such action. *Hauk* v. *Zimmerman,* supra, 260; *Mulcahy* v. *Larson,* supra, 114. A conclusion that the jury exercised merely poor judgment is likewise insufficient. *Jerz* v. *Humphrey,* supra, 226. The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption. *Rood* v. *Russo,* supra, 5; *Jerz* v. *Humphrey,* supra, 224; *Marin* v. *Silva,* supra, 323; *Pischitto* v. *Waldron,* supra; *McKirdy* v. *Cascio,* 142 Conn. 80, 86, 111 A.2d 555; *Mulcahy* v. *Larson,* supra, 114; Maltbie, Conn. App. Proc. § 197. The plaintiff makes no claim that the jury were prejudiced or corrupt. In argument before us and in her brief she does claim that the jury made a mistake, resulting in an award so low that it shocks the sense of justice in that the jury failed to evaluate properly the extent of her injuries and the consequences to her resulting from the accident.

In its memorandum of decision on the motion to set aside the verdict, the trial court demonstrated a firm conviction that the verdict was not inadequate. The memorandum of decision recited that the plaintiff suffered a simple fracture of the pelvis and a simple fracture of the tibula, a cerebral concussion, lacerations and contusions, injuries to her teeth and to her pituitary gland; that she had an excellent recovery from a substantial part of her injuries except that she was unable to have a regular menstrual flow until January, 1970, when it was induced by the administration of estrogen and that it has

been regular since that time with the taking of certain drugs. The court held that in "the light of all the facts the finding of the jury is not so shocking or so unreasonable as to shock one's sense of judgment."

We examine the evidence printed in the appendices to the briefs to determine whether the court abused its discretion in denying the motion to set the verdict aside. *Bates* v. *Frinder,* 161 Conn. 566, 287 A.2d 739; *Hook* v. *Dubuque,* 153 Conn. 113, 114, 214 A.2d 376; *Vogel* v. *Sylvester,* 148 Conn. 666, 668, 174 A.2d 122. Viewing the evidence in the case at bar, it is clear that the jury were afforded a considerable range within which they could properly arrive at a conclusion. Although there was evidence presented which might support a larger award, a less sizable award, such as that found by the jury, could also be supported by the evidence. It is not our function to pick out or select the evidence most favorable to the plaintiff and on the basis of that evidence determine whether the trial court abused its discretion in refusing to set aside the verdict as inadequate. *Carey* v. *Burgess,* 150 Conn. 567, 192 A.2d 43; *Conti* v. *Brown,* 149 Conn. 465, 467, 181 A.2d 591; *Quednau* v. *Langrish,* 144 Conn. 706, 715, 137 A.2d 544. Where a claim is made that the damages are inadequate, our function is to view the evidence printed in the appendices in light of the fact that the jury may reasonably accept or reject all, part or none of the evidence presented which they can reasonably conclude is not to be credited. *Magnotti* v. *O'Brasky,* 159 Conn. 607, 268 A.2d 374; *Verrillo* v. *Green,* 155 Conn. 694, 230 A.2d 20; *Conti* v. *Brown,* supra; *Desmarais* v. *Pinto,* supra, 112; *Butler* v. *Steck,* supra, 118; *Martino* v. *Palladino,* 143 Conn. 547, 549, 123 A.2d

872; *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.,* supra. The evidence as to the nature and extent of the plaintiff's injuries was conflicting and hotly contested. The extent to which the jury accepted the medical testimony is, of course, unknown. The jury were not bound by the opinion of the expert witnesses and could reject in whole or in part their opinion regardless of whether they believed or disbelieved the subordinate facts on which the opinion was based. *Desmarais* v. *Pinto,* supra, 111; *Van Detti* v. *Parsons Bros., Inc.,* 146 Conn. 282, 286, 150 A.2d 200. We decide only whether, on the evidence presented, the jury could fairly reach the conclusion they did. *Conti* v. *Brown,* supra; *Desmarais* v. *Pinto,* supra; *Giambartolomei* v. *Rocky DeCarlo & Sons, Inc.,* 143 Conn. 468, 474, 123 A.2d 760. "The fact that both the court and the jury concurred in their determination is a persuasive argument for sustaining the action of the court on the motion. *Tucker* v. *Halay,* 156 Conn. 633, 634, 242 A.2d 730." *Bates* v. *Frinder,* supra; *Rood* v. *Russo,* supra, 5.

Viewing the evidence printed in the appendices, the jury could reasonably have found as follows: Immediately following the accident on August 3, 1968, the plaintiff was taken to the Norwalk Hospital where she remained three weeks, during which time she had periods of unconsciousness, pain, headaches, slept frequently and received medication and therapy. In the third week she felt much better and wanted to go home. She had sustained a simple fracture of the fibula of the left leg and that leg was not placed in a cast. She also sustained a simple fracture of the pelvis which did not require a cast but was treated by traction, over a period of eleven days, on the right leg. She sustained a cerebral concussion and lacerations in the regions of her neck,

in her right upper lip, the midportion of the chin and in the area of the eyebrow and eyelid, all of which required sutures. All the sutures were removed by August 15, 1968, while she was still at the Norwalk Hospital. Two of her teeth were injured, requiring that one be reshaped and the other crowned. The prognosis for the future health of the teeth was good.

After the third week at the hospital she returned to her home where she was confined to bed for five weeks and suffered nausea, ate very little and lost weight. After five weeks she was able to get around with a walker. She was able to have her friends visit her at home. In October, 1968, she was readmitted to the hospital where she remained for approximately eight days. During this period her nausea stopped and she gained weight. On return to her home and up to Thanksgiving Day of 1968, her activities were somewhat limited. From November 24 to December 20, 1968, she resumed her employment with a fuel company in what had been formerly a summertime job. She returned to college in January, 1969, for the second semester, where she resumed a normal work schedule. In April, 1969, she was readmitted to the hospital for three days where she underwent cosmetic repair surgery on her face and lip. This surgical procedure took about fifteen minutes and was done under general anesthesia. She returned to college, finished the school year and went on to complete the following year of 1970 when she graduated with her class. During all this time at college she had no medical care. At the time of the trial in June, 1970, she was looking for a job and there was no reason not to accept employment. She had attended school in the summer of 1969 in order to make up for the semester lost in the

fall of 1968. During this time, she drove a car each day back and forth, between the town of Wilton and the city of Bridgeport. In November, 1968, with her parents, she attended a football game at Columbia University. Later that month, in a five- to six-hour ride, she traveled by bus to Ithaca, New York, where she remained for a weekend party.

At the time of the trial her condition of fatigue had become very much better since she was taking medication. She no longer had chills. Her nausea was gone and she felt well. She still had a scar about her upper lip and underneath her chin and to correct that condition future hospital procedure was necessary. The contemplated operation for cosmetic improvement involving the scar on the upper lip by means of plastic surgery would involve a hospital expense of $120 to $180 and a surgical fee of approximately $230 to $275. Immediately prior to the accident she was employed by a fuel company in the town of Darien and as a result of her injuries she was unable to work, thereby sustaining a loss of earnings in the amount of $291.

William F. Hughes, the physician in charge of her case, stated that he found evidence of injury to the pituitary gland causing a decreased function which required the supportive taking of medicine by the plaintiff for the rest of her life. At the trial there was testimony that there had been a cessation of her menstrual period. Hughes testified that cessation of the normal menstrual cycle after an accident is not always related to pituitary gland injury and that it may be a common occurrence on an emotional basis. He was unaware that her normal flow related to the menstrual cycle had been reestablished as of January, 1970, for he had not seen the plaintiff for an eight-month period between June, 1969, and

March, 1970. He did not put her on medication for the symptoms he related to the accident.

Jerome E. Klein, an endocrinologist, saw the plaintiff for the first time on July 2, 1969. He testified that he diagnosed her condition as "pituitary insufficiency of a moderate degree," and that by taking various medications she will function as a perfectly normal person; that her condition on April 1, 1970, was excellent with no complaints; and that at that time her urine volume and thirst were normal. He testified that it would be necessary for her to see him or a comparable physician two to four times a year and to take medication for the rest of her life. The cost of the treatment per year would be $100 and the cost of the medication per year would be approximately $100. At the time of the trial the plaintiff had a life expectancy of 44.77 years.

In summary, then, the jury could reasonably have found that the fractures healed properly; that the injuries to her teeth were of minor significance; that the various cuts and bruises were reasonably well healed; that the scars about her upper lip and underneath her chin were not obtrusive and in any event could be eliminated by further treatment; and that despite injury to her pituitary gland she could lead a normal life with the daily intake of medication.

We conclude that from the evidence contained in the appendices it does not appear that the amount of the verdict is so manifestly unjust as to compel a conclusion of partiality, prejudice or mistake on the part of the jury. On the evidence presented therein the jury could fairly reach the conclusion that the damages awarded constituted fair, just and reasonable compensation for the injuries it could reasonably believe the plaintiff sustained. It cannot be

said that the trial court clearly abused its discretion in refusing to set aside the verdict.

The plaintiff cites cases in her brief as authorities for the claim that the award of $22,500 is inadequate. It serves no useful purpose to compare a verdict in one personal injury case with the verdicts in other personal injury cases. *Gorham* v. *Farmington Motor Inn, Inc.,* 159 Conn. 576, 585, 271 A.2d 94; *Lopez* v. *Price,* 145 Conn. 560, 568, 145 A.2d 127; *Fairbanks* v. *State,* 143 Conn. 653, 661, 124 A.2d 893. The question is one peculiarly within the province of the jury. Juries may differ widely in the conclusions which they reach in what may be apparently similar cases, and, in fact, in any given case one jury may arrive at a result substantially different from that of another jury. This flexibility, though it may lead to uncertainty, is a necessary concomitant of the jury system as it operates in cases of this nature. *Fairbanks* v. *State,* supra. "Proper compensation for personal injuries cannot be computed by mathematical formula, and the law furnishes no precise rule for their assessment. *Russakoff* v. *Stamford,* 134 Conn. 450, 455, 58 A.2d 517; *Samaha* v. *Mauro,* 104 Conn. 300, 302, 132 A. 455; *Knight* v. *Continental Automobile Mfg. Co.,* 82 Conn. 291, 293, 73 A. 751." *Lopez* v. *Price,* supra, 569.

The final assignment of error relates to the claim that the trial court committed harmful error by allowing the defendant John T. Heintz to testify briefly concerning the nature and extent of his injuries received in the automobile accident in which he was the operator. Rulings on evidence are tested by the finding. Practice Book § 648; *State* v. *Mahmood,* 158 Conn. 536, 537, 265 A.2d 83; *Katz* v. *Brandon,* 156 Conn. 521, 538, 245 A.2d 529; *Schurgast* v. *Schumann,* 156 Conn. 471, 481, 242 A.2d 695; *Griev-*

*ance Committee* v. *Dacey,* 154 Conn. 129, 150, 222 A.2d 339, appeal dismissed, 386 U.S. 683, 87 S. Ct. 1325, 18 L. Ed. 2d 404; *Facey* v. *Merkle,* 146 Conn. 129, 131, 148 A.2d 261.

During the trial of the case at bar, there was evidence that the defendant John T. Heintz told the investigating police officer that he did not remember what had happened and that he was tired and must have fallen asleep. There was testimony from John T. Heintz that he remembered talking to the police officer but did not remember what he had said to him, and also that his recollection of the accident at the time of the trial was sketchy. Evidence, prior to his testimony, had already been adduced showing that he had been seriously injured and was in apparent pain when the police officer arrived at the scene of the accident; that he was lying on his back in the roadway with his feet inside the car; and that he was taken to the Norwalk Hospital emergency room for treatment along with the plaintiff and the other passenger in the car. On direct examination he answered "Yes" when asked if he was severely injured in the accident. When asked what had happened to him, the plaintiff's counsel objected on the ground that it was not relevant. When asked by the court how he expected to connect this, the defendant's counsel stated that he "[j]ust wanted to show the general background." The court allowed it "for that limited purpose." The plaintiff's counsel took an exception and thereafter the witness answered that he had sustained a dislocated hip, was in the hospital for six weeks and convalesced at home.

The plaintiff argues before us that this objected-to testimony must have created sympathy for the defendant, and that this sympathy could have affected the verdict. At the trial, as already shown, the

objection made to this testimony was on the ground that it was irrelevant. The failure of the plaintiff to comply with our rule (Practice Book § 226) could have misled the court and diverted its attention from the point now pressed on appeal. Had the point now pressed been communicated to the court, it is possible that the objection would have been sustained. Thus, reversible error cannot be predicated on this ruling. *Lavieri* v. *Ulysses,* 149 Conn. 396, 404, 180 A.2d 632; *Casalo* v. *Claro,* 147 Conn. 625, 629, 165 A.2d 153. Furthermore, on the record before us, there is no ground for believing that the ruling, even if erroneous, was materially harmful.

There is no error.

In this opinion HOUSE, C. J., LOISELLE and FITZ-GERALD, Js., concurred.

RYAN, J. (dissenting). The plaintiff suffered a cerebral concussion accompanied by a loss of consciousness, a fracture of the left fibula, a fracture of the pelvis in the right acetabulum, the socket of the hipbone which receives the head of the femur, two cracked teeth, numerous lacerations and an injury to her pituitary gland. As a result of the injury to and the fracture of the acetabulum she will suffer pain and osteoarthritis in her right hip. She was confined to the hospital for three weeks and then, since she was still unable to get out of bed, she was taken home by ambulance. It was necessary for her parents to make special arrangements for her at their home. A hospital bed was obtained and a nurse was hired to take care of her. She was confined to bed continuously for the next five weeks and during that time she could not be left alone and required the constant attendance of another. She was assisted by the nurse and from time to time by her

mother and two sisters. During this period her eating habits became progressively worse; she suffered frequent nausea, ate very little and suffered great loss of weight. Her weight dropped from about 110 to 115 pounds to 82 pounds.

She was readmitted to the hospital in October, 1968, because she was weak, drinking large amounts of fluid and suffering from chills. During a stay of about eight days in the hospital she complained of severe weight loss, thirst and nausea.

In July, 1969, eleven months after the accident, the plaintiff was referred to Jerome J. Klein, an endocrinologist. In her first admission to the hospital evidence of injury to the pituitary gland was found based on the plaintiff's excessive urinary output. The pituitary gland was damaged by a shearing blow or by a hemorrhage into it. Klein obtained the plaintiff's medical history and determined from this that the plaintiff had had no menstrual periods since her release from the Norwalk Hospital; that she had the symptoms of diabetes insipidis, which is polyuria (frequent and profuse urination) and polydipsia (increased thirst), a result of the increased urinary output; and that she was tired at all times. She required more than ten hours of sleep per day and had a noted decrease in axillary hair growth after the accident. She was dizzy on suddenly arising from a sitting or lying position and had a decrease in muscle strength and increased sensitivity to cold. Her general vigor was poor and her appetite was not as it had been prior to the accident. Klein made extensive laboratory tests and found that her thyroid, adrenal and ovarian functions were diminished. Based on clinical and laboratory tests and the medical history, he made a diagnosis of pituitary insufficiency of moder-

ate degree. Normally on hearing of an injury characterized as "of moderate degree" one might get the impression that the injury was not of major importance. That was definitely not so as to the plaintiff in view of Klein's uncontradicted testimony that if this pituitary insufficiency were of a *marked* degree such an insufficiency would not be compatible with life. The pituitary insufficiency was caused by an injury to the pituitary gland, which in turn was caused by a blow to the head incurred in the accident of August 3, 1968. The injury was a rupture of the pituitary gland itself and of the hypothalamus.

The pituitary is the master gland of the body. It controls the secretions of the thyroid gland, the adrenal glands and ovaries in the adult female. It secretes the growth hormone in children and maintains blood sugar in the adult. It controls the thyroid gland, the adrenal glands and the ovaries by means of stimulating hormones. Immediately following the accident the pituitary gland was not secreting the stimulating hormones, which had the effect of making the patient weak, cold and tired and brought about decreased muscle strength and endurance as well as dizziness, frequent and profuse urination, increased thirst and the lack of menstrual periods.

At the time of the trial the plaintiff was taking four medications daily: twenty-five milligrams of cortisone to supply the adrenal hormone; fifty micrograms of cytomel to supply the thyroid hormone; a birth control pill which supplied estrogen and progesterone, and a posterior pituitary powder which is taken as "snuff" by atomizer. These medications are necessary because of the inadequate functioning of the pituitary gland as a result of the accident. The injury to her pituitary gland is perma-

nent. It will be necessary for her to take these four drugs for the rest of her life. It will also be necessary for her to see Klein or a physician of his training and background two to four times a year for the rest of her life. The approximate cost of this treatment per year is $100 and the cost of the drugs is approximately $100 per year.

Should the plaintiff marry and desire children, further medical treatment will be necessary. This treatment would consist of the injection of fertility drugs, which in many cases are the cause of multiple births. In the event the drug replacement therapy were withdrawn for any reason the plaintiff's state of health would deteriorate, her blood pressure would fall, her weight may decline, her sleep requirements would increase, as would her sensitivity to cold. She might actually incur great disability, coma and even death.

The majority opinion emphasizes that the plaintiff could lead a normal life with the daily intake of medication, and there was testimony to this effect which will be examined later in this opinion. The plaintiff was a young lady twenty-one years of age at the time of trial with a life expectation of 44.77 years. The projected cost of drug therapy and medical care for the period of her expectancy is $8954 discounted to the present value of that sum. The plaintiff had other special damages of about $700.[2] The jury's evaluation of her injuries and special damages was $22,500. To say that the plaintiff can lead a normal life if she takes the medications and sees an endocrinologist two to four times a year for the next forty-four years is hardly de-

---

[2] This is exclusive of the sum of $5309.41 for medical expense incurred by the plaintiff's father in her behalf prior to the time she became twenty-one years of age.

scriptive of the uncontradicted facts. This is quite different from saying that the plaintiff is or ever will be a normal person. What is normal about the requirement that she take hormones for the rest of her life? What is normal about a condition which prevents her from having a spontaneous menstrual period? What is normal about a requirement that she take injections of fertility drugs, with the concomitant hazard of multiple births if she desires children? What is normal about a condition which would subject her to great disability, coma and even death in the event, for any reason, that the drug replacement therapy should be withdrawn?

It seems obvious that the jury completely failed to comprehend the tragic and serious consequences of this young girl's injuries. As a result of this they returned a verdict which is clearly inadequate. We know, of course, that it is not the burden of the defendant to disprove the plaintiff's case. Since, however, the defendant saw fit to offer no medical testimony there is no conflict in the evidence arising out of the opinions of other physicians.

I have no disagreement with the majority opinion concerning the law recited therein. It is correctly stated. I do disagree with the application of that law to the facts of the present case. The issue here is not whether this court would allow more or less. It is whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so small as to offend the sense of justice and compel a conclusion that the jury were influenced by partiality, prejudice or mistake. The verdict in the present case is so clearly inadequate that it shocks the sense of justice.

The case should be remanded for a new trial on the sole issue of damages.