[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The above-captioned cases are separate appeals under General CT Page 3533 Statutes 12-118 from final decisions by the Board of Tax Review of the defendant City of Hartford (City) rejecting separate claims by plaintiff Champlin Company, Inc. (CCI) that its properties at 45-55 and 81-99 Bartholomew Avenue in Hartford were overassessed by the City Assessor, at $1,075,800 and $1,757,600, respectively, as part of the October 1, 1989 citywide revaluation. The complaint in each case has been amended to include all tax years since 1989 in which the property in question was owned by CCI[.] The cases were consolidated for trial because of the commonality of the legal and factual issues they involve and of the testimony and other evidence on which they depend.
Law
The trial court hears these cases de novo. Stamford Apartments Co. v. Stamford, 203 Conn. 586, 588 (1987). "Property tax appeals taken pursuant to General Statute Section 12-118 are conducted de novo. Kimberly-Clark Corporation v. Dubno,204 Conn. 137, 144 (1987); Xerox Corporation v. Board of Tax Review,175 Conn. 301, 303 (1978). The plaintiff must prove his case only by a fair preponderance of the evidence. "While . . . proper deference should be accorded to the assessor's valuation, [our courts] . . . have never characterized such deference as a presumption in favor of the validity of the assessment which it is the plaintiff's burden to rebut." Stamford Apartments Co. v. Stamford, Supra. 589.
Nor is the trial court bound by the opinions of the appraisal experts:
 "In determining valuation . . ., the trier, as in other areas of the law, is `not bound by the opinion of the expert witnesses . . . .' Birgel v. Heintz, 163 Conn. 23, 30 . . . . (1972). The referee could have rejected the appraiser's testimony `in whole or in part regardless of [his] belief or nonbelief of the subordinate facts relating to [their opinions]' Fox v. Mason, 189 Conn. 484, 489 . . . (1983)."
 New Haven Savings Bank v. West Haven Sound Development, Supra. 69-70. "In an appeal from the acquistion of property by eminent domain, we concluded that `[u]ltimately, the determination of the value of the land depended on the considered CT Page 3534 judgment of the referee, taking account the divergent opinions expressed by the witnesses and the claims advanced by the parties.' Bennett v. New Haven Redevelopment Agency, 149 Conn. 513, 516, 172 A.2d 612 (1961)." New Haven Savings Bank v. West Haven Sound Development, Supra, 69."
 "Our review of the reasoning and figures utilized by the court reveals that in determining valuation it accepted and rejected portions of each appraiser's testimony in an effort to reach compromise between the conflicting evidence presented. Under the circumstances of this case such an approach, which was clearly an effort to give due regard to all circumstances, was reasonable."
 Whitney Center, Inc. v. Hamden, 4 Conn. App. 426, 429-430 (1985)
The court is thus free, as the trier of fact, to accept or reject the testimony of the witnesses in full or in part.
In an appeal from the action of a local Board of Tax Review, the function of the trial court is to ascertain the true and actual value of the plaintiff's property. Dickau v. Glastonbury,156 Conn. 437, 444, 242 A.2d 777 (1968). The ultimate decision for the court is whether, considering all the evidence, including a viewing of the property, the plaintiff has proved by a fair preponderance of the evidence that the assessment of its property was excessive. Midway Green Corporation v. Board of Tax Review,8 Conn. App. 4440, 442 (1986).
Facts
In support of its claims of overassessment, CCI introduced several pieces of documentary and photographic evidence, successfully requested the Court to conduct a view of both subject properties, and called four live witnesses: City Assessor Robert Hartzell, CCI owner Rowland Champlin; the City's private appraiser, Anthony J. DeLucco, and CCI's own private appraiser, John Farrell, Jr. The City relied generally on the reports and testimony of Messrs. Hartzell and DeLucco for the presentation of its case. Based on all the evidence brought before it, the Court makes the following findings of facts. CT Page 3535
1. The subject properties are both located on the west side of Bartholomew Avenue, about one quarter to one-half mile south of Park Street, in the Parkville section of Hartford. Parkville is a neighborhood featuring a mixture of residential, commercial and light industrial premises which extends westward from Pope Park, along the south side of Park Street, towards the southwest corner of the City.
2. The subject properties are located in an I-2 Industrial zone, wherein minimum lot size is 15,000 square feet and permitted uses include the manufacturing of apparel, metal products, furniture, lumber and wood products, as well as several other commercial, light industrial, office, business and professional uses. As of October 1, 1989, the subject properties were owned by CCI and, except as hereinbelow noted, being used in its manufacturing business, which at all times relevant to this case has been the fabrication of corrugated cardboard shipping containers and laminated wooden beams.
3. The property known as 45-55 Bartholomew Avenue is an irregularly shaped, 1.47-acre parcel which fronts onto Bartholomew Avenue and backs onto the right-of-way of the Penn Central Railroad, approximately halfway between Park Street and Hamilton Street. In October of 1989, this property contained two sets of interconnected one- and two-story industrial buildings, most of which were built in or before 1912.
4. The northernmost complex of buildings on the property, listed as 45 Bartholomew Avenue, consisted two linked structures containing a total of 18,465 square feet of gross leasable space[1][.] The front part of this complex contained a small, finished office area and a larger, unfinished, one-story warehouse in which CCI and its predecessor, the Champlin Box Company, had continuously conducted its box manufacturing business since 1931. Built on a concrete foundation, with brick and masonry exterior walls and a composition roof, this front part of 45 Bartholomew Avenue was heated by a steam boiler, serviced by a 400-ampere electrical service, and fully equipped with sprinklers. As such, it was in fair condition in October of 1989, and thus generally suitable for its ongoing use as a light manufacturing facility. This part of the complex was torn down by its new owner after it was purchased in 1992. The land on which it stood is now a parking lot.
The rear part of 45 Bartholomew Avenue was and is a massive, CT Page 3536 tomb-like structure which was originally designed and built as a steam-generating plant to provide heat to local factories and office buildings. Constructed with reinforced concrete in 1912, this dark, unheated, two-and-one-half-story structure contains 6264 square feet of gross leasable space on its one and only usable floor, which can be only accessed from the outside from through a single loading dock. Below this floor, down a rusting metal staircase, is an uneven basement floor on which a spiderweb of concrete heating tunnels radiate outward from the site of the old coal-fired boiler from which the building takes its name, the "boiler building." Above the upper floor is a badly rusted false ceiling made of corrugated metal, through which a cascade of water from the building's badly leaking roof drenches the building's interior whenever it rains. In sum, the rear part of 45 Bartholomew Avenue is a dilapidated structure, in very poor condition, which can only be made useful for its single plausible function — cold storage of non-perishable goods or materials — if substantial sums of money are expended to repair its deteriorating roof. This is the only part of 45 Bartholomew Avenue which was not torn down by the property's new owners.
The other complex of interconnected buildings which stood on the subject property in 1989, listed as 55 Bartholomew Avenue, was a group of seven linked structures containing a total of 33,870 square feet of gross leasable space. Built at the same time and of the same materials as the front part of 45 Bartholomew Avenue, the front part of 55 Bartholomew Avenue was heated by a steam boiler and suspended blowers, serviced by a 400-ampere electrical service, accessed by multiple loading docks, and equipped with a freight elevator to the second floor. It was in good condition for it existing use as a light manufacturing facility. The rear portions of 55 Bartholomew were less-well-maintained, one-story warehouse spaces, in fair condition for their existing uses as manufacturing and warehouse facilities. Only the front part of 55 Bartholomew Avenue now remains, having been redesigned and rehabilitated for use as the Spaghetti Warehouse restaurant. The balance of the complex has been torn down by its new owners, who have paved the land on which it stood to make a parking lot.
5. CCI's other subject property, known as 81-99 Bartholomew Avenue, is a 3.47-acre parcel located on the northwest corner of Bartholomew and Hamilton Street in Hartford. On the site are four one-story industrial-type buildings of the same general age and construction as the plaintiff's other subject property at CT Page 3537 45-55 Bartholomew Avenue, though they were in much better physical condition in October of 1989. Heated by gas-fired radiant heaters, serviced by 1600-ampere electrical service, fully sprinklered and accessed by three overhead doors, these well-lighted, spacious buildings contain a total of 75,668 square feet of gross leasable space, which now, as in 1989, houses the corporate offices and the box-and-beam manufacturing operations of CCI. Site improvements include paved and gravel parking areas, sidewalks and street curbs, in addition to some chain-link fencing.
6. The revaluation here at issue was conducted by the firm of Cole-Layer-Trumbull (C-L-T), state certified specialists in municipal revaluations. The firm conducted the revaluation by reviewing data previously entered on City property records and conducting limited on-site inspections of the properties in question to establish the fair market values of all Hartford properties as of October 1, 1989.
7. Each Hartford property which was assessed in the 1989 citywide revaluation was examined under two different approaches to valuation: the cost approach and the income approach. Under the cost approach, C-L-T attempted to establish the fair market value of each property by separately calculating the fair market value of its land alone and of its buildings and improvements, then adding the two together. The latter, in turn, was determined by estimating the current cost of rebuilding all existing buildings and improvements or their equivalents, then subtracting depreciation, in view of their current condition and projected economic life. City Assessor, Hartzell, who reviewed the work of the revaluation team and personally decided upon the final assessment for each revalued property, rejected the cost approach for assessing either of the subject properties because of the age and uniqueness of those properties. According to Mr. Hartzell, with whom both private appraisers who testified agreed, the cost approach is more appropriately used to assess newer, more fungible buildings where less speculation is required to determine reconstruction costs and depreciation values. The Court is persuaded by their testimony that the cost approach is an inappropriate vehicle for assessing the fair market value of turn-of-the-century industrial buildings.
8. The second approach used by the revaluation team and the City Assessor was the income approach. Under this approach, which the City ultimately relied upon to set the subject CT Page 3538 properties' assessments, the revaluation team attempted to establish the value of each property by determining its potential to generate income for its owner if put to its highest and best use over the projected life of the owner's investment. This was done by projecting the net operating income which the building would produce annually, then dividing by a capitalization rate. The theory underlying this method of valuation is that when a building is to be purchased for its income-generating potential, no rational investor will pay more for it in an arm's-length transaction on the open market than it can reasonably be expected to return to him as income over its expected economic life. It is widely accepted, moreover, that no bank will loan money for the purchase of a building unless the building will generate sufficient income to enable its owner to make all his payments in full and on time. Banks are legitimately concerned about having to take over buildings which will not pay for themselves if they must be foreclosed upon.
9. To determine the net operating income of a building, the appraiser must first make a reasonable estimate of its potential gross income (PGI). This is done by determining the gross leasable space in the building and multiplying it by the prevailing, per-square-foot market rent for comparable commercial or industrial space in the same locale.
PGI is then reduced to effective gross income (EGI) by subtracting from it that percentage of PGI which will not be realized because of vacancy and collection losses (V/CL). The V/CL reduction is an estimate based on the typical income-generating performance of comparable buildings leased at comparable prices under comparable market conditions.
Next, the appraiser must reduce EGI to net operating income (NOI) by estimating the owner's total annual expenses (AE) to maintain and operate the subject premises as an income-producing property, and subtracting those expenses from EGI. The method of calculating such expenses obviously depends upon the method by which the owner will set his rent. If the owner intends to bill his tenants separately for their heat, utilities, water and other internal operating expenses, both his rent and his expenses should be calculated on a net-net basis, whereby it is assumed that the owner's only expenses from effective gross income will be for building management, maintenance, and outside insurance. If, by contrast, the owner intends to charge his tenants for all of their internal operating expenses as part of their overall CT Page 3539 rent, both rent and expenses should be estimated accordingly.
After NOI is established, the final step in the income approach is to ascertain the proper capitalization rate for the property in the relevant time frame and divide it into the NOI to determine the building's fair market value. To determine the capitalization rate for a subject property, the appraiser or evaluator must first identify the prevailing interest rate at which the owner will be able to borrow money to finance his purchase over the projected life of his investment. Then, if the owner expects to pay his yearly property taxes out of his NOI rather than passing them on to his tenants as a separate charge, the appraiser must add to the interest rate a "tax factor," which is calculated by multiplying the expected mill rate for the property by the standard assessment rate of 70%. The resulting total is the capitalization rate.
10. In applying the income approach to the property at 45-55 Bartholomew Avenue, C-L-T and the City Assessor made the following assumptions, findings and calculations:
 a. In 1989, the average rent for light manufacturing/warehouse space in the City of Hartford was $3.00/square foot, assuming that all internal operating expenses and taxes would be separately billed to the tenant. At the same time, the average rental value for office space associated with light manufacturing or warehouse facilities was $4.50/square foot, based on the same assumption that all taxes and internal operating expenses would be separately billed to the tenant. Because, however, of the below-average condition of 45-55 Bartholomew Avenue in 1989, projected net rent for space in those premises would not exceed 70% of the average net rent for comparable space elsewhere. Accordingly, net rent for office space on the subject property was set at $3.15/square foot, and for warehouse space on that property at $2.10/square foot.
 b. In 1989, gross leasable office space at 45-55 Bartholomew was found to be 1056 square feet. Rented out at $3.15/square foot, this space could generate potential gross income (PGI) CT Page 3540 of $3326. Also in 1989, gross leasable warehouse space at 45-55 Bartholomew Avenue was found to be 68,550 square feet. Based on this finding, C-L-T and the City Assessor determined that the rental of this space at $2.10/square foot would generate PGI of $143,955. Aggregate PGI for 45-55 Bartholomew Avenue was thus found to be $147,281.
 c. C-L-T and the City Assessor estimated the vacancy/collections loss rate for 45-55 Bartholomew at 10%. On that basis they calculated an effective gross income (EGI) for the premises of $132,553.
 d. Assuming, on the basis of available market data, that the average per-square-foot expense for light manufacturing and warehouse space in Hartford was $.033/square foot, exclusive of taxes and internal operating expenses, C-L-T and the City Assessor calculated total annual expense (AE) for managing and maintaining 45-55 Bartholomew Avenue as $22,970, figured by multiplying $.033/square foot times total gross leasable space of 69,606 square feet.
 e. Subtracting AE of $22,970 from an EGI of $132,553, C-L-T and the City Assessor calculated a net operating income (NOI) of $109,583.
 f. Finally, assuming that all property taxes would be separately billed to tenants along with their internal operating expenses, C-L-T and the City Assessor established a capitalization rate (C/R) of .10, based solely on the prevailing market interest rate for industrial loans. Dividing NOI by C/R, they ultimately calculated a fair market value of $1,095,830, which the City adopted and the Board of Tax Review later upheld.
11. The plaintiff sought to rebut the City's calculation of fair market value for 45-55 Bartholomew Avenue by attacking the City's appraisal methods and assumptions and offering the independent valuations of its own appraiser, Mr. Farrell, and of the City's appraiser, Mr. DeLucco. In so doing, the plaintiff proved, to the Court's satisfaction, that the factual findings CT Page 3541 and assumptions of C-L-T and the City Assessor were in error in the following respects:
 a) gross leasable space at 45-55 Bartholomew Avenue was actually 52,335 square feet, not 69,606 square feet, as the City had determined; and
 b) the "boiler building" at the back of 45 Bartholomew was not a heated, three-story structure with over 18,000 square feet of gross leasable space suitable for manufacturing, but a decrepit structure with only 6264 square feet of space on a single, unheated floor which at best could be used for cold storage if substantial repairs were made to its leaking roof.
If adjustments are made to the City's figures to reflect the foregoing findings, the fair market value of 45-55 Bartholomew Avenue would be recalculated as follows:
Potential Gross Income (PGI):
 Space Per Square Sq. Ft. Foot Value Gross Income
 1056 x $3.15 = $ 3,326 (Office)
 6264 x $1.05 = $ 6,577 (Cold Storage)
 45015 x $2.10 = $ 94,532 (Warehouse) ---------- 52,335 $ 104,435 (Total)
Vacancy/Collection Loss (V/CL): = 10%
Effective Gross Income (EGI):
= PGI x (100%-V/CL)
= $104,435 x .9 CT Page 3542
= $ 93,992
Annual Expenses (AE):
 = Gross Leasable Space x Per Square Foot Expense
 = 52,335 square feet x $0.33/square feet
= $17,721
Net Operating Income (NOI):
= EGI — AE
= $94,992 — $17,721
= $76,721
Capitalization Rate (C/R):
= .10
Fair Market Value:
= NOI divided by C/R
= $76,721 divided by .10
= $767,210
12. To rebut the assessor's calculations, even as revised above, the plaintiff presented Messrs. Farrell and DeLucco to explain their respective appraisals of 45-55 Bartholomew Avenue. Both appraisers agreed with the City Assessor that the cost approach to value would be inappropriate for buildings of the age and condition of those here at issue. Both agreed as well that the better two approaches to value would be the income approach used by the City and the comparable sales approach.
The income approach, as described by both appraisers, closely followed the income approach used by the City, though each made different factual assumptions in applying that approach to this CT Page 3543 property.
13. Mr. Farrell, using the income approach, determined that the fair market value of 45-55 Bartholomew Avenue was $711,937. He reached that result as follows:
 a. Assuming a net per-square-foot rental value of $2.30/square foot for light manufacturing or warehouse space in the Parkville section of Hartford, and further assuming, without taking measurements, that in 1989 the subject property contained only 49,000 square feet of gross leasable space, 45-55 Bartholomew Avenue had a potential gross income (PGI) of $122,500.
 b. Assuming further, on the basis of his experience with similar properties in Parkville in the relevant time frame, a vacancy/collection loss rate of 20%, Mr. Farrell calculated effective gross income for the subject premises as follows: (100% — 20%) x $122,500 = $98,000.
 c. Assuming further that annual outside maintenance expenses for the subject property would be $5000 and that annual management expenses, estimated at 3% of effective gross income, would be $2940, Mr. Farrell determined that total net annual expenses (AE) for the subject property would be $7940.
 d. Subtracting AE from EGI, Mr. Farrell calculated the net operating income (NOI) of 45-55 Bartholomew to be $90,060.
 e. According to Mr. Farrell, the prevailing interest rate for bank loans for industrial properties in 1989 was 10.25%, or .1025, expressed as a decimal. To this he added a tax factor of .024, calculated by multiplying the 1989 mill rate of .034 by the standard assessment rate of 70%, for an effective capitalization rate (C/R) of .1265.
 f. Finally, dividing NOI by C/R, Mr. Farrell calculated fair market value as $711,937.
CT Page 3544
14. The Court finds fault with Mr. Farrell's analysis for two principal reasons. First, his figure for gross leasable space is incorrect. The correct figure for gross leasable space, as previously noted, is not 49,000 square feet, but 52,335 square feet. Secondly, Mr. Farrell contradicted himself in his testimony as to whether the figures he calculated were based on the assumption that the owner himself would pay taxes from his net operating income. First, he testified that the owner would not pay the taxes himself, but would separately charge them to his tenants. In that event, it would be inappropriate to add a tax factor to the capitalization rate, for the owner would not lose income by the paying of taxes. Later, however, he claimed that his figures in fact assumed that the property owner would not pay more than a nominal portion of his property taxes from NOI. As a result of this discrepancy, the Court does not have great confidence in Mr. Farrell's appraisal.
Even so, if Mr. Farrell's appraisal were adjusted to reflect appropriate assumptions concerning square footage and capitalization rate, the results would be as follows:
Potential Gross Income (PGI):
= $2.50/square feet x 52,535 square feet
= $130,838
Vacancy/Collections Loss (V/CL):
= 20%
Effective Gross Income (EGI):
= .8 x $130,838
= $104,670
Annual Expenses (AE):
= Maintenance Expenses + Management Expenses
= $5000 + (3% x EGI)
= $5000 + (.03) ($104,670)
CT Page 3545
= $5000 + $3141 = $8141
Net Operating Income (NOI):
= EGI — AE
= $104,670 — 8141
= $96,529
Capitalization Rate (C/R):
= .1025
Fair Market Value:
= NOI divided by C/R
= $96,529 divided by .1025
= $941,746
If the only adjustment to Mr. Farrell's calculation were for square footage, fair market value under the income approach to value would be $763,076, figured as follows:
Net Operating Income (NOI):
= $96,529
Capitalization Rate (C/R):
= Market Interest Rate + Tax Factor
= .1025 + (.70) x (.034)
= .1265
Fair Market Value
= NOI divided by C/R
= $16,529 divided by .1265
= $763,076 CT Page 3546
15. The City's private appraiser, Mr. DeLucco, calculated the fair market value of 45-55 Bartholomew Avenue as follows:
 a. In 1989, gross per-square-foot rental values for light manufacturing or warehouse space of the type found in the subject property was approximately $5.00/square foot. Multiplying that figure by total leasable space of 52,335 square feet produces a potential gross income (PGI) of $261,675.
 b. Assuming, based on his experience in the relevant community, that an appropriate percentage reduction for vacancy and collection losses (V/CL) would be 20%, Mr. DeLucco calculated an effective gross income (EGI) of $209,340.
 c. Assuming further that all leasable space in all buildings on the subject property were heated, Mr. DeLucco calculated gross annual expenses (AE) for the maintenance, management, operation and servicing of tenants in those buildings as $97,500, including $35,000 for heat alone.
 d. Subtracting annual expenses (AE) from EGI, Mr. DeLucco next calculated a net operating income (NOI) of $111,840, from which he explicitly assumed that the property owner would pay his property taxes.
 e. Mr. DeLucco next calculated a capitalization rate (C/R) of .1264, which he rounded upwards to .1270, by adding a base rate of .0994, rounded upwards to .10, to a tax factor of .027, calculated by multiplying the actual post-1989 mill rate of .03858 by the standard assessment rate of 70%.
 f. Finally, Mr. DeLucco calculated a fair market value of $880,629, rounded upwards to $900,000, by dividing his NOI of $111,840 by his capitalization rate of .127.
CT Page 3547
15. Though the Court accepts Mr. DeLucco's measurements of gross leasable space for the buildings here in question, it cannot accept his calculation of potential gross income because of his erroneous conclusion that all such space was heated and presently usable for warehouse or light manufacturing purposes. In addition, though the income approach to value obviously requires the appraiser to make use of estimates, Mr. DeLucco's excessive tendency to round off the base figures from which he made his final calculations unnecessarily deprived the Court of his best estimate of fair market value. Mr. DeLucco's calculation of value should accordingly be redone as follows:
Gross Leasable Space:
= 52,335 square feet
Gross Per-Square-Foot Rental Values:
for warehouse: $5.00/square feet
for boiler building: $2.50/square feet
Potential Gross Income:
 = Gross Rents for Warehouse Space + Gross Rents for Boiler Building
 = $5.00/square feet x 46071 square feet + $2.50/square feet x 6264 square feet
= $230,355 + $13,660
= $247,015
Vacancy/Collection Loss (V/CR):
= 20%
Effective Gross Income (EGI):
= (100% — V/CR) x EGI
= .8 X $247,015
CT Page 3548
= $197,612
Annual Expenses (AE):
 = Expenses Projected by DeLucco — Heat Not Needed for Boiler Building Subtotal
+ Additional Yearly Expenses for Roof
 Assuming that the additional yearly roof expenses will equal the savings to be had from not providing heat, expenses remain the same as calculated by DeLucco = $97,500.
Net Operating Income (NOI):
= EGI — AE
= $197,612 — $97,500
= $100,112
Capitalization Rate (C/R):
= Market Interest Rate + Tax Factor
= .0994 + .027
= .1264 (unrounded)
Fair Market Value:
= NOI — C/R
= $100,112 divided by .1264
= $792,104
In view of the greater clarity and thoroughness of Mr. DeLucco's presentation, and the Court's own findings which require modifications of his estimates and calculations, the Court hereby finds that the fair market value of 45-55 Bartholomew Avenue in October of 1989, calculated under the CT Page 3549 income approach to value, was $792,104.
16. The Court further notes that both appraisers presented substantial evidence concerning the comparable sales approach to value. Under this approach, which both agreed was an excellent approach to value in an active market where many similar properties are being bought and sold, without unusual financing arrangements, in arm's-length transactions, the appraiser attempts to identify truly comparable properties which have been sold in the relevant time frame and to derive from their per-square-foot sales prices a likely per-square-foot sales price for the subject property. This price when multiplied by the gross area of the buildings on the subject property, produces the fair market value under the comparable sales approach to value.
17. The Court rejects both appraisers' estimates of fair market value using the comparable sales approach because, in the Court's judgment,
 a. The market for sales of properties comparable to the subject property in 1989 was not active, and therefore did not generate a sufficient number of sales of properties which were truly comparable to the subject property.
 b. As a result, both appraisers were forced to select properties for comparison purposes which differed markedly from the subject property in a variety of pertinent respects, including age, condition, location, square footage, improvements, and/or type of space available (e.g. office vs. warehouse).
 c. As a further result of these discrepancies, the Court has no faith that either Mr. Farrell's estimated value of $690,000 or Mr. DeLucco's substantially different estimated value of $1,125,000 is anything more than a speculative guess as to value.
In sum, the Court concludes that on the facts here presented, the proper, reliable approach to value is the income approach, as developed by Mr. DeLucco and modified by the Court based on its above-described findings of fact. Under that approach, the fair CT Page 3550 market value of 45-55 Bartholomew Avenue on October 1, 1989 was $792,104.
18. In applying the income approach to the property at 81-99 Bartholomew Avenue, C-L-T and the City Assessor made the following assumptions, findings and calculations:
 a. In 1989, the average rental value for light manufacturing/warehouse space in the City of Hartford was $3.00/square foot, assuming that all internal operating expenses and taxes would be separately billed to the tenant. Because the light manufacturing/warehouse space of 81-99 Bartholomew Avenue was of average quality, it would be rented at $3.00/square foot. Also in 1989, the above-average industrial office space at 81-99 Bartholomew Avenue would generate income at the rate of $6.50/square foot, assuming that all taxes and internal operating expenses would be passed on to the tenant by separate billing.
 b. In 1989, gross leasable office space at 81-99 Bartholomew Avenue was 7774 square feet. Rented out at $6.50/square foot, this space could generate a potential gross income (PGI) of $50,531. Also in 1989, gross leasable warehouse space at 81-99 Bartholomew Avenue was found to be 70,260 square feet. Based on this finding, C-L-T and the City Assessor determined that the warehouse space at 81-99 Bartholomew had a PGI of $210,780. Aggregate PGI for 81-99 Bartholomew was thus found to be $261,311.
 c. Unlike 45-55 Bartholomew Avenue, C-L-T and the City Assessor estimated that the vacancy/collection loss (V/CL) rate for 81-99 Bartholomew Avenue would be 20%. On that basis they concluded that the premises had an effective gross income (EGI) of $209,049.
 d. Assuming, as they did for 45-55 Bartholomew Avenue, that the average per-square-foot CT Page 3551 expense for light manufacturing and warehouse space in Hartford was $0.33/square foot, exclusive of taxes and internal operating expenses, C-L-T and the City Assessor calculated total annual expenses for the warehouse space at 81-99 Bartholomew Avenue as $23,186. Assuming further that the annual expenses for managing and maintaining office space at 81-99 Bartholomew would be $1.33/square foot, exclusive of taxes and internal operating expenses, C-L-T and the City Assessor calculated the total annual expense attributable to office space as $10,339. On this basis, total annual expense (AE) for operating and maintaining 81-99 Bartholomew Avenue, exclusive of taxes and internal operating expenses, was found to be $31,525.
 e. Subtracting AE of $33,525 from EGI of $209,049, C-L-T and the City Assessor calculated net operating income (NOI) of $175,524, rounded to $175,600.
 f. Finally, assuming that all property taxes would be separately billed to tenants along with their internal operating expenses, C-L-T and the City Assessor established the same capitalization rate (C/R) they had set for 45-55 Bartholomew: .10. This was based solely on the prevailing market interest rate for industrial loans in October of 1989. Dividing NOI of $175,600 by the C/R of .10 produced a fair market value of $1,757,600, which the City adopted and the Board of Tax Review later upheld. In reaching this conclusion, the City Assessor rejected C-L-T's alternative valuation under the cost approach to value for the same reasons he rejected such an approach to the valuation of 45-55 Bartholomew Avenue.
19. Here, as with 45-55 Bartholomew Avenue, the plaintiff sought to rebut the City's calculation of fair market value by attacking the City's appraisal methods and assumptions and CT Page 3552 offering the independent appraisals of Messrs. Farrell and DeLucco. In so doing, the plaintiff proved to the Court's satisfaction that C-L-T and the City Assessor erred in finding that gross leasable warehouse space in 81-99 Bartholomew Avenue was 70,200 square feet. In fact, as previously noted, both private appraisers agreed that total gross leasable space in all buildings on the subject property was 75,668 square feet. On that basis, still accepting the City's finding that 7774 square feet of this total was office space, the Court finds that there were only 67,894 square feet of warehouse space on the subject property in 1989. If an appropriate adjustment is made to the City's figures to reflect this difference, fair market value would be recalculated as follows:
a. Potential Gross Income (PGI):
 Per Square Sq. Ft. Foot Value Gross Income
 7,764 x $6.50 = $ 50,531 (Office)
 67,894 x $3.00 = $203,682 (Warehouse) --------- -------- 75,668 $254,193 (Total)
b. Vacancy/Collection Loss (V/CL): 10%
c. Effective Gross Income (EGI):
= PGI x (100% — V/CL)
= $254,193 x .8
= $203,354
d. Annual Expenses (AE):
Office Expenses 7,774 x $1.33 = $ 10,339
 + Warehouse Expenses 67,884 x $0.33 = + 22,485 ------ CT Page 3553 TOTAL $ 32,744
e. Net Operating Income (NOI):
= EGI — AE
= $203,354 — $32,744
= $170,610
f. Capitalization Rate (C/R):
= .10
g. Fair Market Value:
= NOI divided by C/R
= $170,610 divided by .10
= $1,706,100
21. Mr. Farrell's calculation of fair market value under the income approach to value was very similar to his calculation for 45-55 Bartholomew Avenue. His resulting estimate of $1,070,000 was reached as follows:
 a. Assuming that the prevailing rental value of warehouse space in the Parkville section of Hartford was $2.50 per square foot in 1989, and further assuming that the subject property had 75,668 square feet of gross leasable space, the subject property had a potential gross income (PGI) of $189,170.
 b. Assuming further, as did C-L-T and the City Assessor, that the vacancy and collection loss (V/CL) rate for the subject property would be 20%, effective gross income (EGI) would be calculated as follows: (100% — 20%) x $189,170 = $151,336.
c. Assuming further that annual outside CT Page 3554 maintenance expenses for the subject property would be $5000 and management expenses would equal 3% of EGI, or $4550, total annual expenses (AG) for the property would be $12,540.
 d. Subtracting AE from EGI, Mr. Farrell determined that the net operating income (NOI) for 81-99 Bartholomew Avenue would be $138,796.
 e. According to Mr. Farrell, the capitalization rate (C/R) for the subject property would be .1295, calculated by adding a tax factor of .027 to the .1025 decimal equivalent of what he claimed to have been the prevailing interest rate for industrial loans in 1989. The tax factor was calculated by multiplying the actual post-1989 tax rate of .03858 by the standard assessment rate of 70% Mr. Farrell never explained why he used a different C/R for 81-99 Bartholomew than he did for 45-55 Bartholomew.
 f. Finally, dividing his NOI of $138,196 by his C/R of .1295, Mr. Farrell calculated fair market value of $1,071.783, which he rounded down to $1,070,000.
22. The Court finds fault with Mr. Farrell's analysis for three reasons: First, it disagrees with his assumption that the superior office and warehouse space at 81-99 Bartholomew Avenue would be rented out at the same per-square-foot rental as the inferior space at 45-55 Bartholomew Avenue. Second, it is puzzled by Mr. Farrell's use of a tax factor to calculate his capitalization rate, in view of his original testimony, on this property as on 45-55 Bartholomew, that the owner would not pay taxes from his net operating income. Third, it has received no explanation at all for Mr. Farrell's use a different capitalization rate for each of the subject properties. Because the Court has no confidence in the thoroughness or internal logic and consistency of Mr. Farrell's appraisal and testimony, it need not and will not recalculate fair market value on the basis of his assumptions. CT Page 3555
23. Mr. DeLucco, by contrast, offered a more thorough, coherent view of the valuation process, reaching a fair market value of $1,550,000 by the income approach, in accordance with the following assumptions and calculations:
 a. Gross leasable space at 81-99 Bartholomew Avenue in 1989 totalled 75,668 square feet, for which a gross per-square-foot rent of $4.00/square foot, not including heat or utilities, would be charged. Potential gross income (PGI) for the subject property was thus estimated to be 75,000 square feet (rounded down) x $4.00/square foot = $300,000.
 b. Agreeing with Mr. Farrell and the City Assessor that the vacancy and collection loss (V/CL) would be 20%, Mr. DeLucco calculated its effective gross income (EGI) as follows: (100% — V/CL) x PGI = .8 x $300,000 = $240,000.
 c. Assuming, to reiterate, that all tenants would pay separately for their heat and electricity, Mr. DeLucco calculated gross annual expenses (AE) for the subject property as follows:
 Insurance — Outside $ 5,000 Liability only Advertising 2,500 Snow Removal 1,000 Management 10,000 Reserves for replacement and maintenance 25,000 Water ------------------------ ------- TOTAL EXPENSES (AE) $44,500
 d. Subtracting AE from EGI, Mr. DeLucco calculated a net operating income of $195,500, from which he explicitly assumed that the property owner would pay his property taxes.
CT Page 3556
 e. Mr. DeLucco next calculated a capitalization rate (C/R) of .1264, which he again rounded upwards to .1270, using the same method he had used to calculate the C/R for 45-55 Bartholomew Avenue.
 f. Finally, dividing NOI of $195,5000 by C/R of .1270, Mr. DeLucco calculated a fair market value of $1,539,370, which he rounded upwards to $1,550,000.
24. Here, as with the plaintiff's other subject property, the Court accepts Mr. DeLucco's measurements of gross leasable space and is persuaded that he has taken a thorough approach to the valuation question here presented under the income approach to value. It concludes, however, that his data must be corrected in several respects to avoid possible distortions in his ultimate calculation of fair market value which might arise from his pronounced tendency to round off the base data figures on which he relies. Specifically, the Court concludes that the following data corrections must be made:
 a. Gross leasable space must be left at 75,668 square feet, not rounded down to 75,000 square feet.
 b. The expense figure for management should be calculated at the rate of 5% of PGI, as indicated by Mr. DeLucco in the body of his appraisal, not rounded up or down to a different figure.
 c. The expense figures for water and snowplowing on this property, whose outside paved surfaces and leasable space are appreciably larger than those of 45-55 Bartholomew, must be made at least equal to those used for the smaller property. Each figure must thus be raised from $1000 to $2500.
25. When fair market value is recalculated in light of the above-described adjustments, Mr. DeLucco's assessment of fair market value decreases to as indicated below. CT Page 3557
Potential Gross Income (PGI):
 = Gross Per-Square-Foot Rental Value x Gross Leasable Space
= $4.00/square foot x 75,668 square feet
= $302,672
Vacancy/Collection Loss (V/CL):
= 20%
Effective Gross Income (EGI):
= (100% — V/CL) x EGI
= .8 x $302,672
= $242,138
Annual Expenses (AE):
 Insurance — Outside $5,000 Liability only Advertising 2,500 Snow Removal 2,500 Management 15,134 (5% x PGI) Reserves for replacement 25,000 and maintenance Water 2,500 ------------------------ ------- TOTAL EXPENSES $52,634
Net Operating Income (NOI):
= EGI — AE
= $242,138 — $52,034
= $189,404
Capitalization Rate (C/R): CT Page 3558
= .1264
Fair Market Value:
= NOI — C/R
= $189,404 divided by .1264
= $1,498,450
The Court hereby concludes that the fair market value of 81-99 Bartholomew Avenue in October of 1989 was $1,498,450.
26. The Court must finally note that in reaching its finding of fair market value for 81-99 Bartholomew Avenue it has rejected the testimony offered by both private appraisers under the comparative sales approach to value. The Court concludes that because the market for the sale of industrial properties like the subject property was inactive in 1989, there was insufficient data available to enable either appraiser to make an adequate selection of truly comparable properties to compare with the subject property. As a result, both appraisers again selected properties which differed markedly from the subject property in one or more of the following respects: age, condition, location, square footage, improvements, type of space available (e.g., office, warehouse). The Court therefore finds that neither Mr. Farrell's estimated value of $1,060,000 nor Mr. DeLucco's estimated value of $1,800,000 is an accurate assessment of the property's worth in October of 1989. Therefore, to restate it, the Court finds that the most sensible way to evaluate the property at 81-99 Bartholomew Avenue as of October 1, 1989 is the income approach to value, as developed by Mr. DeLucco and recalculated by the Court above.
Conclusion
Because the values of the plaintiff's subject properties, as assessed by the City of Hartford in the October 1, 1989 citywide revaluation, are excessive, the plaintiff's appeals are sustained. The 100% values of these properties are hereby reset as follows:
45-55 Bartholomew Avenue $ 782,104
81-99 Bartholomew Avenue $1,498,450 CT Page 3559
So Ordered this 8th day of April 1994.
Michael R. Sheldon, J.